**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN C. LESKO, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 11-1049 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| JOHN E. WETZEL, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM AND ORDER

### I. MEMORANDUM

John C. Lesko's Petition for a Writ of Habeas Corpus (Doc. 12) will be denied, and a certificate of appealability will be granted only as to Claims I and II.

#### A.    Introduction

At the end of December 1979, the petitioner, John Lesko, and his co-defendant, Michael Travaglia, went on multi-day killing spree, which the media later dubbed the "kill for thrill murders," that took them through several Pennsylvania counties. By the time the police apprehended them in downtown Pittsburgh the evening of January 3, 1980, they had murdered four people.

Their first victim was Peter Levato. On December 27, 1979, Lesko and Travaglia abducted him in downtown Pittsburgh near the Edison Hotel. They drove him to a remote area in Westmoreland County where they robbed him and then threw him off a bridge. When Levato did not die as a result of the fall, Travaglia shot him in the back of the head with a .22 caliber gun.

Their second victim was Marlene Sue Newcomer.  In the early morning hours of January 1, 1980, Lesko and Travaglia were hitchhiking when Newcomer, who was returning home from a New Year's Eve party, offered them a ride.  They took control of her vehicle, tied her up, and robbed her.  Several tortuous hours later, Lesko shot and killed her with the same .22 caliber gun that had been used to kill Levato.  Newcomer's killing also occurred in Westmoreland County.  Later that same day, Lesko and Travaglia abandoned her vehicle, with her body in it, in the Gimbel's parking lot in downtown Pittsburgh.

Their third victim was William Nicholls.  On January 2, 1980, Lesko and Travaglia were back in the Edison Hotel area of downtown Pittsburgh.  Fifteen-year-old Ricky Rutherford was with them.  They abducted Nicholls and took him and his car, which was a silver-colored Fiat Lancia, to Indiana County.  At the beginning of their trip, Travaglia shot Nicholls in the arm with the same .22 caliber handgun that they had used to kill Levato and Newcomer.  Lesko and Rutherford handcuffed Nicholls, stuffed cigarette butts down his throat and gagged him with a scarf.  Lesko and Travaglia eventually tied a large rock to Nicholls's body and threw him into Blue Spruce Lake.  At some point during this horrific ordeal, Nicholls died.  They kept his car, which had the wallet they stole from him in it, and drove to Travaglia's father's house, where they stole a .38 caliber Colt Cobra snub-nose revolver.  After Lesko discovered that they did not have the right bullets for the gun, they went back to Travaglia's father's house and stole those too.

Their fourth victim was Officer Leonard Miller.  After they stole the .38 caliber handgun and bullets, Lesko, Travaglia and Rutherford traveled to Apollo, in Armstrong County.  By this point, Travaglia was driving them in Nicholls's Fiat Lancia.  At around 4:45 a.m., they saw a police car parked outside a Stop-N-Go.  Although they were driving in a car they had stolen from a man they had just murdered, they decided to goad the officer into chasing them.

2

Leonard Miller was the police officer. He was working the midnight to 8:00 a.m. shift. He was 21 years old and had been employed as a full-time Apollo police officer for only three days. The first time the Fiat Lancia sped past him, Office Miller did not pursue it. When it came speeding by him at least one more time, Officer Miller gave chase and eventually pulled the car over. As he approached it, Travaglia shot him twice with the .38 caliber handgun they had stolen from his father's house. Officer Miller radioed into police headquarters that he had been shot. Back-up officers quickly arrived at the scene, but it was too late. Officer Miller was lying on the highway, dead from two bullets wounds.

Officer Miller returned fire before he was killed and he shot out at least one of the windows of the Fiat Lancia. Lesko, Travaglia and Rutherford decided to abandon the damaged vehicle. They eventually made their way back to downtown Pittsburgh, where the police apprehended them later that evening. Lesko and Travaglia were individually interrogated. Both gave statements implicating themselves in the murders of Levato, Newcomer, Nicholls and Officer Miller.

This case concerns Lesko and Travaglia's murder of Officer Miller. Following various delays due to two changes of venue and a mistrial, they were tried in a consolidated trial in January 1981 in the Court of Common Pleas of Westmoreland County on charges of murder and conspiracy to commit murder of Officer Miller. Rutherford, who was 16-years-old at the time of the trial, had an agreement with the District Attorney of Westmoreland County and testified as a witness for the prosecution. The jury (which had been selected from Berks County) found that both defendants were guilty of first-degree murder. There was no dispute that Travaglia was the one who fired the shots that killed Officer Miller (he had admitted that fact in his statement to the

police).  The jury determined that Lesko was equally culpable for Officer Miller's murder as Travaglia's accomplice.

Following a subsequent penalty trial, the same jury sentenced both defendants to death. As a result of a federal habeas proceeding that concluded in 1992, Lesko had another sentencing hearing in the court of common pleas in February 1995.  The jury at this proceeding once again sentenced Lesko to death.

Before this Court is Lesko's Petition for a Writ of Habeas Corpus [ECF No. 12], filed pursuant to 28 U.S.C. § 2254.  Lesko asserts that he is entitled to a new trial or, at a minimum, another sentencing hearing.  He raises six guilt-phase claims (Claims I, II, III, IV, XX, and part of Claim XXII) and numerous sentencing-phase claims (part of Claim I and Claims V-XIX and XXI-XXII). After careful consideration, this Court concludes that Lesko is not entitled to federal habeas relief on any of his claims.

This case has a lengthy and complex factual and procedural history that spans more than 30 years.  Only that which is pertinent to the evaluation of the claims that Lesko raises in his habeas petition will be discussed.  There have been over 13 court decisions issued in Lesko's lengthy state and federal proceedings, and he cites them in his brief as Lesko I through Lesko XIII.  [ECF No. 30, Brief at i].  In order to remain consistent with his method of citation, the Court will use it herein.

**B.     The 1981 Guilt-Phase Trial**[1]

The court of common pleas appointed Rabe F. Marsh, Esq., to represent Lesko at his

trial.[2]  Marsh was a local attorney with a private practice.  The court appointed the Westmoreland

County Public Defender, Dante G. Bertani, Esq., to be Travaglia's counsel.  Bertani was

Travaglia's lead counsel and Timothy J. McCormick, Esq., who worked in the Public Defender's

Office, was co-counsel.

Lesko's and Travaglia's interests coincided to a large extent during the pre-trial and trial

proceedings and defense counsel worked together in many ways when appropriate, including

cross-examining the prosecution's witnesses.  From 1999 through 2002, several hearings were

held in the court of common pleas during the litigation of Lesko's state petition for collateral

relief, which he filed pursuant to Pennsylvania's Post-Conviction Relief Act ("PCRA").  At the

PCRA hearing conducted in 2002, Bertani explained that he did "the bulk of the cross

examination for all of the witnesses" and Marsh, who typically would cross-examine a witnesses

after Bertani, followed up to the extent that Bertani missed something, or if there was something

particular that applied to Lesko's defense.  (Apr. 2002 PCRA Hr'g Tr. at 155-56).

---

[1]      The Court shall refer to Respondents as the "Commonwealth."  The Commonwealth has submitted the
common pleas court's complete file, which contains documents indexed 1 through 415.  Those documents are cited
herein as "CP Doc. __ ".

[2]      Marsh represented Lesko at every stage of his trial, direct appeal and 1995 re-sentencing –
including his first round of state collateral and federal habeas corpus proceedings.  Marsh was assisted by co-counsel
Welsh White, Esq., in Lesko's original direct appeal to the Pennsylvania Supreme Court and in his first federal
habeas proceedings.  At the 1995 re-sentencing, Marsh was assisted at trial by co-counsel Brian O'Leary, Esq., and
by Paul G. Kay, Esq., on direct appeal.
        During Lesko's second state collateral proceeding, which concluded in 2011, Lesko was represented by
Robert Brett Dunham, Esq., Samuel J.B. Angell, Esq., and Eric J. Montroy, Esq., all with the Federal Community
Defender Office for the Eastern District of Pennsylvania.

At the trial, the prosecution wanted to introduce evidence of the three other murders that the defendants committed during their multi-day crime spree. (Vol. I, Trial Tr. at 3). The court ruled that evidence related to Levato's and Newcomer's murders was inadmissible. It held, however, that the events surrounding Nicholls's murder, about which Rutherford would testify, was admissible as evidence of motive and intent. The trial court explained that it was admitting the evidence because it was probative of the prosecution's theory that Officer Miller, whom the defendants intentionally had provoked into chasing them, was killed because he had approached perpetrators of murder and theft in possession of incriminating evidence, namely, Nicholls's stolen car and wallet, and the gun used to shoot him in the arm when he was first abducted. Both defendants moved to limit Rutherford's testimony, but the trial judge denied their motion, ruling that the details of the Nicholls murder were relevant to each defendant's state of mind. The court explained that the severity of the Nicholls murder, and its temporal proximity, made it more likely than not that the defendants would attempt to avoid apprehension at any costs, going so far as to murder a police officer. (Vol. I, Trial Tr. at 298-99, 309-11, 330, 332).

Rutherford testified that in the late hours of January 2, 1980, he was at hotdog shop in downtown Pittsburgh. Lesko and Travaglia were there too. (Id. at 345-46). They asked Rutherford if he "wanted to go and do some partying." (Id. at 347). Rutherford told them that he did, and he and Lesko walked outside and waited in an alleyway by the Edison Hotel. (Id. at 347-49). After about five to ten minutes, Travaglia and another man drove into the alleyway in a "silver sports car." (Id. at 350). The other man was Nicholls, and he was driving his silver Fiat Lancia. Travaglia was in the front passenger's side seat and he told Rutherford and Lesko to get into the car. (Id.)

Rutherford testified that Travaglia pulled out a gun and pointed it at Nicholls and shot him in the arm. (Id. at 351). Nicholls was not critically injured, and Travaglia forced him to continue to drive them. They traveled for approximately 45 minutes. (Id. at 353). Rutherford testified that Nicholls was "real nervous and worried about what was going to happen to him." (Id.) Eventually, Nicholls was directed to stop the car. Travaglia took over the driving duties and Nicholls was forced into the back seat. Lesko got into the back seat of the car also, and he gave Rutherford a pair of handcuffs and told him to cuff Nicholls's arms behind his back, which Rutherford did. (Id. at 354-55). According to Rutherford, Nicholls kept asking them: "what are you going to do to me?" (Id. at 354).

By this point, Rutherford testified, the group was outside the city limits and driving in a wooded area. Lesko began to punch Nicholls with his closed fist and called him a "queer" and asked him if he wanted to perform oral sex on him. (Id. at 356). Lesko pulled out a knife and called Nicholls a "sissy." (Id.) Nicholls begged Lesko to stop but, Rutherford testified, Lesko and Travaglia both just laughed and Lesko hit him again. (Id. at 357). Eventually, Lesko took Nicholls's scarf and told Rutherford to gag Nicholls with part of it and then tie the rest of it around his mouth. Rutherford followed Lesko's instructions. By this point, Rutherford stated, Nicholls was unconscious. (Id. at 358).

Rutherford testified that Lesko stole from Nicholls "his belongings, a wallet, and extra set of keys and some other stuff," and those items were put into the glove compartment of the car. (Id. at 359). The wallet had several items of identification for Nicholls, including a driver's license and credit cards. (Id. at 502).

Rutherford testified that Travaglia drove to a lake. Travaglia told him to go and get a rock, which Rutherford did. Nicholls's hands were still cuffed, and Lesko and Travaglia bound

his legs with a belt. Rutherford stated that Travaglia broke a hole into the iced-over lake and Travaglia and Lesko dragged Nicholls down to it. Travaglia and Lesko returned to the car without Nicholls. (Id. at 360-67). They had thrown Nicholls into the lake, and told Rutherford that Nicholls "came back up out of the water one time" and "he coughed and he went back down." (Id. at 367).

Next, Rutherford testified, he, Lesko and Travaglia drove to Travaglia's father's home. Lesko and Travaglia exited the car and came back after two or three minutes with a .38 caliber handgun. As Travaglia started driving away, Lesko "was looking at the gun, and he said that there was only birdshot in it." (Id. at 370). Travaglia turned around and drove back to his father's house. Lesko and Rutherford got out of the car this time, and Lesko stood guard while Rutherford went into the garage to steal a box of bullets. Rutherford testified that before he went into the garage, Lesko gave him a gun and told him that if someone came in that he "had six shots to get out." (Id.)

Rutherford and Lesko returned to the car with the bullets for the .38 caliber handgun. It was that gun and those bullets that would be used to kill Officer Miller a short time later. At this point in time, Lesko was seated in the front passenger seat, Travaglia was driving, and Rutherford was in the back seat. Eventually, as they were driving down a hill they saw a police car parked on the side of the road. Rutherford testified that Travaglia said "[l]et's have some fun with this cop. And he went speeding past him, and beeped the horn, but the cop, he just sat there." (Id. at 371). Rutherford described what happened next:

> He [Officer Miller] just sat there, and [Travaglia] turned around after he went over – like it was a bridge. And he turned around and he went back up, on the other side of the road, and the cop just still stayed there. And so he [Travaglia] turned around again and came back down the road, and this time he [Travaglia] ran a red light or – and he beeped the horn again and he ran a red light, and the

cop, he turned on his lights and started coming after us. John [Lesko], he told me
to lay down in the back, because it might turn into a shooting gallery.

   ---

   I laid down in the back, with my head toward the driver's side of the car.
And about maybe ten seconds after that, Mike pulled off the side of the road, or
stopped, and I was laying down in the back, and I could see the lights from the
police car behind me. And then the window – Mike rolled the window down,
and then the cop, he come up to the door, and Mike shot him.

(Id. at 371-72). Rutherford stated that Officer Miller returned fire and one of his shots broke a

window of the Fiat Lancia. Nobody in the car was hit by a bullet, and after Officer Miller fell,

Travaglia drove from the scene. Eventually, the three of them abandoned the car and left on

foot. (Id. at 373-74).

  Lesko, Travaglia and Rutherford made their way back to Pittsburgh and by around

7:30 p.m. on January 3, 1980, they were in the area of the Edison Hotel again. They ran into

another acquaintance, Daniel Montgomery, a frequent cohort of theirs, who in fact the police

initially suspected of having been involved in Officer Miller's murder. Montgomery testified at

the trial that he was in a hotel room with Travaglia and Lesko that evening when Travaglia stated

"I shot a cop[,]" and Lesko stated "I wanted to." (Id. at 481-82). He testified that Travaglia gave

him the gun he used to kill Officer Miller. (Id. at 482, 486). On cross-examination by Bertani,

Montgomery admitted that Travaglia also told him when they were in the hotel room that the

shooting of Officer Miller had been an accident. (Id. at 491). After Montgomery left the hotel

room, he went to the hotdog shop across the street, and soon thereafter plainclothes police came

in, questioned him, found the .38 caliber handgun on him, and arrested him. The police soon

located Lesko, Travaglia and Rutherford and arrested them as well.

  Lesko and Travaglia each gave tape-recorded interviews to the police. During his

testimony at the 1981 trial, Detective Frank Amity, with the City of Pittsburgh Police,

read Lesko's heavily-redacted statement. Lesko's interview started at 1:16 a.m. on January 4, 1980. At the beginning of the transcribed interview, Detective Amity asked him if he understood that he will be charged with murder for the killing of Officer Miller. Lesko stated that he understood. (Id. at 611). Lesko told the police that he was seated in the front passenger's side of Nicholls's car when they saw Officer Miller. He stated that they ran through a red light and sped by Officer Miller at about 85 to 90 miles an hour. (Id. at 611-17). In response to Detective Amity inquiry about why they would have sped by a police officer, Lesko replied: "I guess to draw the cop's attention." (Id. at 615). When asked why they wanted the officer to chase them, Lesko replied: "So he'd be chasing us, … and the car was fast and that – we'd lose him and could go and knock off the Stop-N-Go." (Id. at 617). Detective Amity testified that during the interview Lesko did not express any remorse, regret or sorrow that Officer Miller had been killed. (Id. at 622).

Detective Ronald B. Freeman, also with the City of Pittsburgh Police, conducted Travaglia's tape-recorded interview, which, like Lesko's, took place early in the morning of January 4, 1980. During his trial testimony, Detective Freeman read Travaglia's heavily-redacted statement. Travaglia acknowledged that he has been charged in the death of Officer Miller. (Vol. II, Trial Tr. at 679). When asked to explain what occurred, Travaglia admitted that he purposely ran a red light and sped by Officer Miller in order to provoke the officer into chasing them. (Id. at 683). He stated that it was his intent to "aggravate" the officer. (Id. at 682). Travaglia stated that he pointed his gun at Officer Miller thinking that he (Officer Miller) would toss his gun aside and "I could get away and I wouldn't get caught with anything." (Id. at 687-88. See also id. at 682). Travaglia told the officers that "[i]n the process of pulling the gun on him, the hammer slipped and the shot discharged." (Id. at 682). He explained that Officer

Miller "stumbled backwards, and he fell down on one knee, and he started to get back up; that's when I fired the second [shot]." (Id. at 690). Detective Freeman asked Travaglia during the interview why he decided to "aggravate" Officer Miller, and Travaglia replied: "I don't know. I was just – like I said, I – drinking and drugs and stuff like that, a loose night, that's all…. Trying to play games with him was what I was doing." (Id. at 684).

Lesko's and Travaglia's defense to the charge of first-degree murder was that they lacked the requisite intent to kill. Neither defendant testified at trial. However, the statements they made to the police, which the prosecution had introduced into evidence, were relied on by defense counsel in support of their respective defense theories. Referring back to Lesko's statement that in instigating the police chase, the defendants planned to first divert Officer Miller from the Stop-N-Go store, and then return to rob it, Marsh urged the jury to find Lesko guilty of second-degree (felony) murder, not first-degree murder. He argued that the killing of Officer Miller was not premeditated, but was the unintended result of a botched robbery attempt. (Vol. II, Trial Tr. at 1175-91). Travaglia's defense was that, as he told the officers during his initial interview, he accidentally shot Officer Miller. In addition, he raised a diminished capacity defense in which he claimed that his heavy drug use and mental infirmities resulted in the inability to form the requisite specific intent to kill. Travaglia introduced several witness to support that defense. (Id. at 1194-1220).

The prosecutor noted in his closing argument that Lesko's and Travaglia's statements to the police gave in part inconsistent versions of what occurred the morning that Officer Miller was shot, as did Rutherford's trial testimony. For example, neither Travaglia nor Rutherford mentioned anything about the group's intent to rob the Stop-N-Go, as Lesko had in his statement. The prosecutor explained that the Commonwealth was "under no obligation to dovetail all of the

statements that were made by all of the witnesses[,]" and told the jurors that they must use their common sense to evaluate the evidence.  (Id. at 1223).  The prosecutor pointed out that notwithstanding the inconsistencies in some of the testimony, the evidence established the necessary facts to convict both Travaglia and Lesko of first-degree murder.  That the defendants intentionally provoked Officer Miller to chase them was beyond dispute.  They sped by him once, and when he failed to pursue them they sped by him at least one more time.  The defendants did all of this knowing full well that they could not allow Officer Miller to apprehend them because they were driving in a stolen car.  A car inside which they had just shot and beat Nicholls before dumping his body in a lake.  A car that would easily link them to being Nicholls's murderers.  Thus, when they goaded Officer Miller into chasing them, the prosecutor argued, they did so as part of a plan and with the intent to kill him.  They had the gun and the bullets that they had stolen from Travaglia's father shortly beforehand to do just that.  (Id. at 1221-39).

The prosecutor discussed the statement that Rutherford said that Lesko made to him right before Officer Miller was murdered (you better get down "because it might turn into a shooting gallery") (id. at 1227, 1236), and the statement that Montgomery testified Lesko made to him several hours after the murder ("I wanted to [kill the cop]") (id. at 1228, 1237), but those statements were just one of the many pieces of evidence that the prosecution relied upon to make the first-degree murder case against Lesko.

At the conclusion of the trial, the jury convicted both defendants of first-degree murder and conspiracy for the killing of Officer Miller.  Because the Commonwealth was seeking the death penalty against both defendants, their trial was followed by a hearing before the same jury

to determine the sentence to be imposed.  The jury decided that each defendant should be sentenced to death.

In 1983, the Pennsylvania Supreme Court affirmed Lesko's and Travaglia's sentences of death.  Commonwealth v. Travaglia, 467 A.2d 288 (Pa. 1983) (consolidated direct appeal), cert. denied, 467 U.S. 1256 (1984).  Two years later, the Pennsylvania Supreme Court affirmed the common pleas court's decision to deny Lesko's motion for collateral relief, which he had filed pursuant to Pennsylvania's Post Conviction Hearing Act (the predecessor to the PCRA).  Commonwealth v. Lesko, 501 A.2d 200 (Pa. 1985) ("Lesko III").

In 1986, Lesko filed with this Court his first petition for a writ of habeas corpus pursuant to 28 U.S.C § 2254.[3]  He raised claims challenging both the guilt phase and the sentencing phase of his 1981 trial, and contended that he was entitled to a new trial altogether or, at a minimum, a new sentencing hearing.  One of the guilt-phase claims in Lesko's 1986 habeas petition was that the trial court erred in permitted Rutherford's testimony discussing the details of Nicholls's murder, and that that error violated his Fourteenth Amendment right to a fair trial.  This Court originally granted Lesko relief on that claim, but the United States Court of Appeals for the Third Circuit reversed.  One of the more preposterous contentions that Lesko makes throughout this current habeas case is that his participation in Officer Miller's murder was "relatively minor."[4]  He also contends that the key pieces of evidence the prosecution relied upon to secure a

---

[3]    The Honorable Alan N. Bloch presided over Lesko's first federal habeas case.

[4]    Lesko repeatedly claims that the Third Circuit recognized during the litigation of his first federal habeas case "that [his] participation in the homicide was relatively minor[.]"  [See, e.g., ECF No. 30, Brief at 34 n.19 (quoting Lesko v. Lehman, 925 F.2d 1527, 1546 (3d Cir. 1991) ("Lesko VIII")].  The Third Circuit did no such thing.  Lesko has taken the comment made by the Third Circuit entirely out of context.  The court was not expressing its belief that Lesko's participation in Officer Miller's murder was in fact "relatively minor."  Nor was it making a statement that can be fairly read as questioning the evidence introduced to support Lesko's first-degree murder conviction.  Pennsylvania's death penalty statute lists numerous mitigating circumstances that a jury can
*Continued on next page...*

13

first-degree murder conviction were the two statements that Rutherford (you better get down "because it might turn into a shooting gallery") and Montgomery ("I wanted to [kill the cop]") attributed to him. Therefore, it is worth repeating the Third Circuit's decision that the trial court did not err in allowing Rutherford's testimony, because it shows that it was Lesko's actions in the hours and minutes leading up to the murder of Officer Miller, not merely the two statements he made to Rutherford and Montgomery, that evidenced his intent to kill, and that his participation in the murder was anything but "relatively minor":

> We find that just as the occurrence of the Nicholls murder was relevant, the Nicholls incident as a whole was relevant to a central issue in the case – the motive and state of mind of Lesko and Travaglia. As we have discussed, the Commonwealth sought to demonstrate that both the trigger-man Travaglia and passenger Lesko, if approached by a law enforcement officer, intended to go to any length to hide the facts of their prior crime and, moreover, had motive to take such a drastic approach. Where the motive of a killing is interference with law enforcement – in this case the most extreme example, killing a policeman – the severity and circumstances of the crime being hidden is highly probative. If, for example, the Nicholls killing had been accidental, or in self-defense, Lesko arguably would have been less likely to take such extreme measures to avoid apprehension. On the other hand, apprehension and prosecution for a murder as deliberate as the Nicholls homicide, could have dire consequences in the event of a conviction. Furthermore, Rutherford's account of the events leading to the Miller homicide conveys the temporal proximity of the Nicholls homicide, which reinforces the Commonwealth's theory that the Nicholls murder figured prominently in defendants' minds as Officer Miller approached the stolen sports car.

---

find. One of them is "[t]he defendant's participation in the homicidal act was relatively minor." See 42 Pa. Cons. Stat. § 9711(e). When the Third Circuit made the statement that Lesko so often mis-cites, it merely was noting that the jury may have found that statutory mitigating circumstance at the 1981 sentencing hearing, although it further noted that one could not be sure because the jury did not specifically list which mitigating factors it found. Lesko VIII, 925 F.2d at 1546 (citing Vol. III, Trial Tr. at 1731-32). Incidentally, at Lesko's 1995 resentencing, he once again argued that the jury should find as a mitigating factor that his participation in Officer Miller's murder was "relatively minor." The jurors rejected this argument. Not one of them found the existence of that mitigating circumstance. (CP Doc. 207).

It is nonsense to suggest, as Lesko's does, that his participation in Officer Miller's murder was "relatively minor." Moreover, later in Lesko VIII, in discussing Lesko's claim that his death sentence was an unconstitutionally disproportionate penalty for his participation in Officer Miller's murder, the Third Circuit concluded that "[t]he record clearly establishes" that Lesko's participation in the felony committed was "major." 925 F.2d at 1551.

As we have already suggested, Rutherford's testimony is also probative to rebut Lesko's defense regarding his state of mind during the Miller incident. First, by stressing that the incident was best characterized as "felony murder," Lesko was essentially urging the jury to believe that while he admittedly agreed to instigate the car chase, he had no knowledge from the surrounding circumstances that the chase would culminate in murder, and played no role in promoting such an outcome. During his summation, Lesko's counsel argued that Lesko's remark that "this place might turn into a shooting gallery" was "the statement of any would-be robber in a car driven by a man with a gun...." In other words, Lesko was asserting that he had participated in a crime – but that crime was attempted burglary or robbery, not first degree murder. To view the Miller incident in isolation would render Lesko's claim plausible. On the other hand, Lesko's assertion that in the moments before the Miller killing, he had promoted only the commission of robbery and burglary (but not murder) appears less credible if one learns that just a few hours before, both he and Travaglia had deliberately and fully participated in the Nicholls homicide. In this context, this evidence was probative to show that in participating in the instigation of the police chase and through his talk about a "shooting gallery," Lesko shared Travaglia's intent to open fire and encouraged Travaglia to do so.[11]

> [11] We note that under Pennsylvania law, the least degree of concert or collusion is sufficient to sustain a finding of responsibility as an accomplice. Commonwealth v. Coccioletti, 493 Pa. 103, 109, 425 A.2d 387, 390 (1981).

In a second and related aspect of his defense, Lesko portrayed himself as a passive observer of Travaglia's allegedly unilateral decision to open fire on Officer Miller. Lesko's lawyer argued in summation that "John Lesko was sitting in the car as Ricky Rutherford was.... He was a passenger. He didn't shoot Officer Miller. Ricky Rutherford didn't shoot Officer Miller. Mike Travaglia shot Officer Miller." Similarly, during summation, Lesko's lawyer read from Lesko's statement to the police, in which Lesko explained that, "[the officer] put on his lights and started chasing us. The police officer went down, and that there. I heard six shots come through the window beside me, and when I looked up, it was all busted out...." Thus, the *in limine* motion offered by defendants was sparse and, from an evidentiary point of view, sterile. The motion proposed to stipulate only that Nicholls had been killed and that Lesko possessed items tying him to the crime, including a gun, a wallet, and a stolen car. The jury would not have learned that Lesko had willingly and fully participated in all of the evening's activities, which included a prior homicide.

In summary, the central issue in the Commonwealth's case against Lesko was whether he deliberately supported Travaglia in a premeditated killing of Miller or whether he was guilty only of participating in an abortive attempt at robbery. Members of the jury could not have determined what was in Lesko's mind based solely on the events immediately preceding Miller's death. The jury

could only have fairly evaluated the Commonwealth's theory regarding Lesko's state of mind by hearing evidence tending to show that Travaglia and Lesko had jointly embarked that evening on a crime spree, that they had already committed a homicide likely to command the death penalty, and that they had in their possession powerful evidence of their guilt of that homicide. Moreover, to be in a position to evaluate Lesko's state of mind during the critical moments during the Miller encounter, the jury needed to hear sufficient details about these matters to be able to appreciate the nature of the evening's joint undertaking, the relationship and mood of the participants, and the extent of the criminal exposure of those participants in the event of their apprehension by Miller. If one views Rutherford's testimony as furnishing the overall context in which Travaglia and Lesko acted in the few minutes preceding Miller's death, then this testimony plays a critical role in enabling the jury to evaluate the Commonwealth's proposed scenario as compared with the defendants' alternative explanation of events.

Lesko v. Owens, 881 F.2d 44, 53-55 (3d Cir. 1989) ("Lesko VI") (additional footnotes omitted).

The ultimate outcome of Lesko's first habeas case was that his guilt-phase claims were denied, but he was granting sentencing-phase relief. The Third Circuit held that he was entitled to such relief because in closing arguments at the 1981 sentencing hearing, the prosecutor: (1) commented upon Lesko's failure to testify concerning the merits of the charges against him, in violation of his Fifth Amendment privilege against self-incrimination and the rule set forth in Griffin v. California, 380 U.S. 609 (1965); and (2) exceeded the bounds of permissible advocacy by imploring the jury to make its death penalty determination in the cruel and malevolent manner shown by the defendants when they tortured and drowned Nicholls and shot Officer Miller. Lesko VIII, 925 F.2d at 1540-46.

The Third Circuit also remanded the case to the district court with the additional instruction that, before the district court issued the writ, it conduct an evidentiary hearing on the issue of whether the guilty plea that Lesko had entered in the Nicholls's criminal case in Indiana County was voluntary. If the district court determined that it was not, the Third Circuit instructed, the writ was to issue to the extent that Lesko sought relief from the sentencing phase

of his 1981 trial "subject to the additional requirement that evidence of the guilty plea not be introduced at the resentencing proceeding." Id. at 1555.

Upon remand, the magistrate judge to whom the case was referred presided over the evidentiary hearing. It was determined that the guilty plea that Lesko had entered in the Indiana County case was involuntary and, therefore, could not be used in the subsequent resentencing hearing. The magistrate judge's report and recommendation was adopted as the opinion of the district court on February 20, 1992. Lesko v. Lehman, No. 86-cv-1238, 1992 WL 717815 (W.D. Pa. Feb. 20, 1992) ("Lesko IX"). As a result of this, the fact that Lesko had been convicted of murdering Nicholls could not be used by the prosecution as an aggravating circumstance at his resentencing hearing.

In February of 1995, the court of common pleas presided over a seven-day sentencing hearing, at the conclusion of which the jury returned a verdict of death. (CP Doc. 207). The Pennsylvania Supreme Court affirmed Lesko's sentence on direct review in 1998. Commonwealth v. Lesko, 719 A.2d 217 (Pa. 1998) ("Lesko X"), cert. denied, 525 U.S. 1108 (1999).

Next, Lesko filed a petition for collateral relief under the PCRA. In that proceeding, he challenged both his 1981 convictions and his 1995 sentence of death. On August 7, 2006, the PCRA court issued a decision in which it granted Lesko relief on certain of his guilt-phase and sentencing-phase claims and held that Lesko was entitled to be completely retried for his role in the 1980 murder of Officer Miller. Commonwealth v. Lesko, No. 681 C 1980, slip op. (C.P. Westmoreland Co. Aug. 7, 2006) ("Lesko XII") (CP Doc. 389). See also Commonwealth v. Lesko, No. 681 C 1980, slip op. (C.P. Westmoreland Co. Nov. 22, 2000) ("Lesko XI") (CP Doc. 310). The claims that the PCRA granted relief upon coincide with the claims that

Lesko raises in his current habeas petition as Claims I, II, and V. It denied relief with respect to all other claims. The Commonwealth appealed, and Lesko filed a protective cross appeal as to those claims that the PCRA court denied.

In 2011, the Pennsylvania Supreme Court reversed the PCRA court's decision with respect to those claims upon which it had ruled in Lesko's favor. Commonwealth v. Lesko, 15 A.3d 345 (Pa. 2011) ("Lesko XIII"). It held that, aside from one portion of a Brady claim, all of Lesko's guilt-phase claims were untimely under the PCRA's jurisdictional time limitations, set forth at 42 Pa. Cons. Stat. § 9545(b)(1). Lesko XIII, 15 A.3d at 359-73. The Pennsylvania Supreme Court held that the one part of the guilt-phase Brady claim that was timely filed lacked merit, as did all of Lesko's sentencing-phase claims. Id. at 371-417.

In 2012, Lesko filed the instant petition. [ECF No. 12]. After considering substantial briefing from both sides on the issue, this Court determined that Lesko's petition is not "second or successive" and, therefore, is not subject to the requirements of 28 U.S.C. § 2244(b). [ECF No. 24]. After the Court issued that decision, Lesko filed his brief in support of his petition. [ECF No. 30]. Thereafter, the Commonwealth filed its answer [ECF No. 35], Lesko filed his reply [ECF No. 37], and the Commonwealth filed its final response [ECF No. 39].

## C.    Guilt-Phase Claims

### Lesko's Guilt-Phase Claims Are Not Procedurally Defaulted

The Pennsylvania Supreme Court denied all but one of Lesko's guilt-phase claims on procedural grounds. As just mentioned, except for a portion of a Brady claim that was based upon evidence first disclosed during the PCRA proceeding (a January 8, 1980 police report, referred to herein as the "Steffee report"), Lesko's guilt-phase claims were untimely under the

PCRA's statute of limitations.[5]  Lesko XIII, 15 A.3d at 359-73.  The court concluded that Lesko's

guilt-phase claims became untimely after January 16, 1996, the effective date of the PCRA's

provision addressing timeliness and successive collateral petitions.  Id. at 366.

The Commonwealth argues that this Court must conclude that all of the guilt-phase

claims that the Pennsylvania Supreme Court dismissed as untimely are procedurally defaulted for

the purposes of federal habeas review.  A petitioner may be barred from federal habeas relief for

a "procedural default" when a state court has denied his claim based upon a state procedural rule

that is both "independent" and "adequate."  See, e.g., Coleman v. Thompson, 501 U.S. 722, 729-

30 (1991).  A state procedural rule is "adequate" if it is "firmly established and regularly

followed" at the time that the alleged procedural default occurred – which in this case was on or

before January 16, 1996 (the effective date of the PCRA).  Ford v. Georgia, 498 U.S. 411, 423-

24 (1991) (quoting James v. Kentucky, 466 U.S. 341, 348-51 (1984)); Albrecht v. Horn, 485

F.3d 103, 115 (3d Cir. 2007) ("Whether a procedural rule was firmly established and regularly

applied is determined as of the date the default occurred, and not as of the date the state court

relied on it, because a petitioner is entitled to notice of how to present a claim in state court.")

(internal citations and quotations omitted).  This Court, of course, has no authority to review the

Pennsylvania Supreme Court's decision on the purely state law issue of whether Lesko's guilt-

phase claims are timely under the PCRA.  A federal court's investigation of the adequacy of a

state rule is not akin to appellate review of a state court's procedural decision and, thus, the

question before this Court in this case is not whether the state court erred in dismissing Lesko's

---

[5]        The Pennsylvania Supreme Court found that that portion of Lesko's Brady claim regarding the Steffee
report was timely filed because that report was not disclosed to Lesko until the PCRA proceeding.  For that reason,
the court concluded, it had jurisdiction to consider that portion of the Brady claim in which Lesko argued that the
prosecution suppressed the Steffee report.  Lesko XIII, 15 A.3d at 371.

guilt-phase claims on procedural grounds. The question whether a state procedural ruling is "adequate" to bar federal habeas review is a separate question of federal law. See, e.g., Beard v. Kindler, 558 U.S. 53, 60 (2009). Thus, the issue here is whether, under federal law, the application of the state procedural rule was "adequate" at the time the alleged default occurred.

Lesko contends, *inter alia*, that the Pennsylvania Supreme Court's procedural ruling was not based on an "adequate" state law grounds sufficient to establish federal procedural default for at least two reasons. First, he points out that the Pennsylvania Supreme Court acknowledged in its decision that the "terms of the PCRA do not specifically address the scenario presented here" and that the court thus faced a "novel question." Lesko XIII, 15 A.3d at 360. For this reason alone, Lesko argues, the "novel" rule the Pennsylvania Supreme Court first announced and applied to his guilt-phase claims cannot qualify as "adequate" to bar federal habeas review of his guilt-phase claims. Since the rule was first announced in the Pennsylvania Supreme Court's February 24, 2011, decision, Lesko's argument goes, it could not have been firmly established on January 16, 1996 the date the court determined his default occurred. Second, Lesko argues that Pennsylvania's prior "relaxed waiver" practice in capital cases precludes any finding of adequacy. See, e.g., Lark v. Sec'y Pennsylvania Dept. of Corr., 645 F.3d 596, 612 (3d Cir. 2011) (describing the "relaxed waiver" rule; holding that it was not firmly established on January 16, 1996 that the PCRA's statute of limitations would be enforced against petitioners in capital cases). See, e.g., Morris v. Beard, 633 F.3d 185, 191 (3d Cir. 2011).

The Commonwealth does not provide any convincing arguments to counter Lesko's. The one argument that the Commonwealth does make is that in light of the Supreme Court's more recent decisions in Walker v. Martin, 562 U.S. 307 (2011) and Beard v. Kindler, 558 U.S. 53 (2009), Pennsylvania's "relaxed waiver rule" in capital cases no longer precludes a finding of

procedural adequacy.  As Lesko points out, however, the Third Circuit has rejected the Commonwealth's argument regarding the impact of <u>Walker</u> and <u>Kindler</u>.  <u>Lark</u>, 645 F.3d at 611-613.

Based upon all of the foregoing, this Court is not precluded under the procedural default doctrine from considering Lesko's guilt-phase claims on the merits.

### Standard of Review of Lesko's Guilt-Phase Claims

Lesko's petition is governed by the federal habeas statute applicable to state prisoners, 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Under this statute, "[t]he Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Errors of state law are not cognizable in a federal habeas action.  <u>See</u>, <u>e.g.</u>, <u>Priester v. Vaughn</u>, 382 F.3d 394, 402 (3d Cir. 2004) ("Federal courts reviewing habeas claims cannot 'reexamine state court determinations on state-law questions.'") (quoting <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991)).

In describing the role of federal habeas proceedings, the United States Supreme Court noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence.... The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

<u>Barefoot v. Estelle</u>, 463 U.S. 880, 887 (1983).

In 1996, several years after Lesko's first federal habeas proceeding concluded, Congress enacted AEDPA, which "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002). AEDPA "requires federal courts collaterally reviewing state proceedings to afford considerable deference to state courts' legal and factual determinations." Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004); see also Lewis v. Horn, 581 F.3d 92, 109-18 (3d Cir. 2009). AEDPA reflects the view that habeas corpus is a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 786 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment)).

AEDPA's standard of review is codified at 28 U.S.C. § 2254(d) and it provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted **with respect to any claim that was adjudicated on the merits in State court proceedings** unless the adjudication of the claim–

    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added). Thus, AEDPA circumscribes a federal habeas court's review of a state prisoner's constitutional claim when the state court adjudicated that claim on the merits and denied it. For the purposes of § 2254(d), a claim has been "adjudicated on the merits in State court proceedings" when a state court has made a decision that finally resolves the claim

based on its substance, not on a procedural, or other, ground.  See, e.g., Richter, 131 S. Ct. at

784-785; Robinson v. Beard, 762 F.3d 316, 324 (3d Cir. 2014).  "Section 2254(d) applies even

where there has been a summary denial."  Cullen v. Pinholster, — U.S. — , 131 S. Ct. 1388,

1402 (2011) (citing Richter, 131 S. Ct. at 786).

Because the Pennsylvania Supreme Court did not adjudicate Lesko's guilt-phase claims

on the merits, AEDPA's standard of review set forth at § 2254(d) does not apply and this Court

must review them *de novo*.[6]

## Claim I

### The **Brady** Claim

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that the suppression

by the prosecution of evidence favorable to an accused violates due process where the evidence

is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

prosecution.  Id. at 87.  The precepts of Brady are premised upon the most basic of constitutional

guarantees to a person accused of a crime:  a right to due process of law and a fair trial.  In our

system of criminal justice, the government is not entitled to send a person to prison while it

conceals from him favorable evidence that would tend to reasonably call into question his guilt.

Impeachment evidence falls within the category of evidence that must be disclosed because

"[t]he jury's estimate of the truthfulness and reliability of a given witness may well be

determinative of guilt or innocence."  Napue v. Illinois, 360 U.S. 264, 269 (1959); Giglio v.

---

[6]  The Pennsylvania Supreme Court held that Lesko failed to establish that the suppression of the Steffee report was material under Brady.  Lesko XIII, 15 A.3d at 372-73.  Lesko argues that since Brady requires a cumulative prejudice analysis, and since this Court must review on the merits those other portions of the Brady claim that the Pennsylvania Supreme Court did not consider, this Court must review Lesko's entire Brady claim *de novo*.  This Court will follow Lesko's suggested analysis because, even under a *de novo* review, Lesko's Brady claim does not entitle him to federal habeas relief.

United States, 405 U.S. 150, 153-54 (1972); see also United States v. Bagley, 473 U.S. 667 (1985).

To prevail on his Brady claim, Lesko has the burden of demonstrating: 1) favorable evidence was suppressed by the prosecution; and 2) the suppressed evidence was material. See e.g., Slutzker v. Johnson, 393 F.3d 373, 386 (3d Cir. 2004); see also Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

Lesko claims that the prosecution violated its obligations under Brady when it suppressed the following information:

1. A copy of the "Agreement and Statement of Intent" signed by Daniel Montgomery and the District Attorney of Westmoreland County on March 26, 1980 (Def.'s PCRA Ex. GG);

2. The police report prepared by Trooper Michael K. Steffee of the Pennsylvania State Police on January 8, 1980 (the "Steffee report") (Def.'s PCRA Ex. KK); and,

3. Information from Richard Rutherford's juvenile file that Lesko contends could have been used to impeach Rutherford at trial. (Def.'s PCRA Ex. RR).

The Commonwealth does not contest that the documents listed in items 2 and 3 were not disclosed to Lesko. As for the document listed in the item 1 (the "Agreement and Statement of Intent"), the Commonwealth argues that Lesko has not established that the prosecution did not give it to defense counsel. For the reasons discussed below, this Court has serious doubts that the prosecution actually failed to disclose the written document. However, Lesko contends that the PCRA court made a finding of fact that a copy of the "Agreement and Statement of Intent" was not provided to defense counsel and that this Court is bound by that factual determination. Assuming that is true, the record nevertheless shows that Marsh was aware at the time of the

1981 trial about the agreement between Montgomery and the District Attorney and what the relevant terms of that agreement were.

Ultimately, Lesko's Brady claim is denied because, even if this Court accepts that the prosecution suppressed all of the documents listed in the items numbered 1 through 3 above, Lesko has failed to prove that the cumulative impact of the suppressed documents was material. To understand why, it is necessary to go beyond the facts as presented by Lesko, and set forth a more detailed description of the undisclosed items, the other information defense counsel had available to them, and the other relevant facts.

### Background Relevant to Montgomery

The police arrested Montgomery on the evening of January 3, 1980, around the same time that Lesko and Travaglia were being arrested. Shortly afterward, at approximately 12:15 a.m. on January 4, 1980, Officers Hennigan and Serifini interviewed him. Their report (the "January 4, 1980 police report," Def.'s PCRA Ex. HH), shows that Montgomery told the officers that he had been in a room at the Edison Hotel with Lesko and Travaglia and that Travaglia had given him the .38 caliber handgun. Montgomery told the officers that Travaglia gave him the gun because he (Montgomery) had been robbed recently and wanted a gun for protection. Montgomery did not state that he knew anything about Officer Miller's murder. In fact, he told the officers that before he left the hotel room "Lesko had mention[ed] that they had been working on a sheep farm that day." (Def.'s PCRA Ex. HH at 2). Lesko admits that Marsh had in his possession the January 4, 1980 police report at the time of the 1981 trial. [ECF No. 30, Brief at 36].

The next day, on January 5, 1980, Officers Condemi, Amity and Liberi interviewed Montgomery again. Their report (the "January 5, 1980 police report," Def.'s PCRA Ex. II) shows that Montgomery once again stated that the gun that he had on him when he was arrested was Travaglia's. The report reflects that Montgomery "would not admit to any criminal activities **and doesn't know anything about the murders**." (Def.'s PCRA Ex. II at 2 (emphasis added)). Lesko admits that Marsh had in his possession the January 5, 1980 police report at the time of the 1981 trial. [ECF No. 30, Brief at 36].

On January 8, 1980, Trooper Michael Steffee, with the State Police's Indiana County station, interviewed Montgomery once again. In the Steffee report, Trooper Steffee wrote that Montgomery acknowledged meeting with Lesko and Travaglia at the Edison Hotel on the evening of January 3, 1980, but said that they "never told me about killing anyone" and that he "don't know anything about the cop getting shot or any armed robberies." (Def.'s PCRA Ex. KK). There is no dispute that the prosecution failed to disclose the Steffee report.

By March 26, 1980, Montgomery was ready to cooperate with the prosecution. On that date, he arrived at the Westmoreland County District Attorney's Office in order to give a statement. Montgomery's attorney, Richard Pohl, Esq., accompanied him. Also present were Assistant District Attorney Henry Martin, Esq., Assistant County Detective Harry DelleDonne, two deputy sheriffs, and a court reporter who transcribed the proceeding. The 51-page transcription of the meeting was admitted at the PCRA hearing as Def.'s PCRA Ex. D. There is no dispute that the prosecution provided to defense counsel a copy of the transcript of the March 26, 1980 meeting prior to the 1981 trial.

During the proceeding conducted on March 26, 1980, Montgomery gave a statement that implicated Lesko and Travaglia in the murder of Officer Miller, among many other crimes.

Prior to giving his statement, Montgomery and the District Attorney signed the "Agreement and Statement of Intent."  That document shows that the District Attorney agreed not to prosecute Montgomery for any "offenses against property (burglary, robbery and theft)" he committed in Westmoreland County during November and December 1979 and January 1980.  In exchange, Montgomery agreed to "freely, completely, truthfully and candidly advise and provide the District Attorney of Westmoreland County, and any investigators … with a full and complete statement of his knowledge concerning the deaths of Leonard C. Miller, Marlene Sue Newcomer, and Peter A. Levato and shall testify as a witness for the Commonwealth of Pennsylvania, if requested to do so" by the District Attorney.  (Def.'s PCRA Ex. GG at 1-2).

The transcript of the March 26, 1980 meeting indicates that Montgomery entered into the agreement with the District Attorney in exchange for his cooperation and truthful statements, and that the agreement pertained "to crimes and offenses generically described as offenses against property, such as burglary, robbery and theft and similar crimes[.]"  (Def.'s PCRA Ex. D at 11-12).  The transcription also reveals that the agreement was contingent upon the District Attorney of Indiana County entering into a similar agreement with Montgomery and the District Attorney of Allegheny County "nol prossing a charge of a violation of a section of the Pennsylvania Firearms Act."  (Id. at 10).

After the discussion of the agreement concluded, DelleDonne questioned Montgomery about how he knew Lesko and Travaglia and the relevant events.  It was during this interview that Montgomery explained that when he was with Lesko and Travaglia in a room at the Edison Hotel on the evening of January 3, 1980, Travaglia told him "[g]oddamn, I shot a cop" and Lesko said "I wanted to[.]"  (Id. at 29, 31).  Montgomery also stated that on January 2, 1980, the day before Officer Miller was shot, Lesko told him that they had a contract to kill a cop and stated

27

"we're going to get that cop." Montgomery said that he remembered what Lesko told him because it "scar[ed] the hell out of" him. (Id. at 29; see also id. at 27-30).

Montgomery testified at the suppression hearing, which was held over the course of six days in September 1980. During his testimony, there was a discussion about the agreement he had entered into with the District Attorney. A review of the suppression hearing transcript establishes that Marsh and Bertani knew about the agreement and had received from the prosecution the transcript of the March 26, 1980 proceeding in which the agreement was discussed. (Supp. Hr'g Tr. at 414-15, 439-42). Bertani stated that although the prosecution had given them the transcription of the March 26, 1980 proceeding, they had not received the written "Agreement and Statement of Intent." (Id. at 414-15, 400). The prosecutor stated that to his knowledge that document "was disclosed sometime ago to both defense counsel." (Id. at 414). He also stated that he had "asked [Bertani] if there was anything they thought we might have and didn't get and received no response." (Id. at 440). The prosecutor then stated: "I'll get them a copy this afternoon. Again, if they don't have it, it's due to inadvert[e]ncy." (Id.)[7]

When Montgomery testified at the 1980 trial, neither Marsh nor Bertani asked him a single question about the agreement he had with the District Attorney. Nor did either attorney

---

[7]    Lesko does not direct the Court to any statement made after the suppression hearing but prior to his trial that would evidence that the prosecution failed to provide defense counsel with a copy of the "Agreement and Statement of Intent." For example, he does not point to any statement contained in any other pre-trial or trial transcript in which defense counsel complained that the prosecutor failed to follow up on the promise made at the suppression hearing to provide (perhaps another copy of) the document to defense counsel. In fact, discussions during the 1981 trial show that the prosecutor permitted defense counsel to personally review the prosecution's entire case file. This information was revealed during a discussion that the trial court, defense counsel, and the prosecutor were having regarding the disclosure of the "Agreement and Statement of Intent" that Rutherford had entered into with the District Attorney. The prosecutor insisted that he had giving that document to defense counsel and remarked that he had permitted Marsh and Bertani "to come over and review my files without my even being present, and you did; you came in one day, and you did it. The files are enormous. And you went over the files with Harry." Although the prosecutor insisted that he had given defense counsel a copy of Rutherford's "Agreement and Statement of Intent," he stated that he would give them another copy of the document "right now." (Vol. I, Trial Tr. at 334). Neither Marsh nor Bertani complained at that time that they had not received Montgomery's "Agreement and Statement of Intent."

question Montgomery about the fact that the statements he gave to the police in the days following his arrest were so different from the testimony he gave at trial. Although defense counsel did not have a copy of the Steffee report, they had the January 4, 1980 and the January 5, 1980 police reports, but did not ask Montgomery to explain the discrepancy between what he had told the police on those dates and his trial testimony.

### Background Relevant to Rutherford

Rutherford was the prosecution's key witness at the January 1981 trial. Although the prosecution introduced other evidence to show that Lesko and Travaglia intentionally provoked Officer Miller into chasing them, and that Travaglia shot Officer Miller twice after he pulled them over, it was through Rutherford's testimony that the prosecution was able to paint the full and horrific picture of what Lesko and Travaglia did on January 2 and 3, 1980, and that the killing of Officer Miller was part of an ongoing crime spree that began the day before when they abducted Nicholls.

Rutherford had an agreement with the prosecution that in exchange for his testimony, his criminal charges would be disposed of in juvenile court. As set forth below, defense counsel was fully informed about the agreement and cross-examined Rutherford about it. Also, at defense counsel's request, prior to Rutherford's testimony the court instructed the jury that he was an accomplice and his testimony, therefore, "should be looked upon with disfavor because it comes from a corrupt and polluted source." (Vol. I, Trial Tr. at 349-44).

Before Rutherford testified, the jury learned through Bertani's cross-examination of Trooper Robert G. Luniewski that Rutherford faced the very same charges of murder and conspiracy to commit murder as Lesko and Travaglia were being tried for, and that those charges

were still pending against Rutherford at the time of the trial.  (Id. at 53-54).  Bertani cross-examined Rutherford first.  He was able to make the point through his cross-examination that Rutherford participated in the crimes against Nicholls and was not just "along for the ride." (Id. at 390-93).  Bertani asked Rutherford if he had an agreement with the "district attorney's office over your testimony here in court?"  Rutherford replied:  "Yes."  Rutherford explained that in exchange for his testimony, it was agreed that his case would be handled in juvenile court and that nothing he testified to could be used against him unless he gave testimony that was not truthful.  (Id. at 394. See also id. at 406, "for my testifying, my case will be handled in juvenile, and that nothing I say here in court will be used against me unless I lie.").  Bertani asked Rutherford:  "Remember one of the parts of that agreement is that the deal you have with the D.A.'s office doesn't conclude until after you testify in court? …. [That] [a]nything that is done with your deal doesn't happen until you testify in court against other people[?]"  (Id. at 401). Rutherford responded:  "Yes."  (Id.)

    In his cross-examination, Marsh also questioned Rutherford about his agreement with the prosecution.  Rutherford admitted that he spent a number of hours talking with the District Attorney about the testimony that he was going to give at the trial.  (Id. at 405).  Marsh rhetorically asked Rutherford whether he knew that the alternative "to spending a year in the Juvenile Detention Center" was "being tried as an adult for criminal homicide."  Rutherford responded:  "Yes."  (Id.)

    During the PCRA proceeding, Lesko obtained in discovery a copy of documents from Rutherford's juvenile case file.  Those documents were admitted at the PCRA hearing as Def.'s PCRA Ex. RR.  As mentioned above, the Commonwealth does not contest Lesko's contention that the documents in the juvenile file should have been disclosed to defense counsel prior to the

1981 trial.  The juvenile file contains three documents that Lesko argues provide a "tremendous

amount to impeachment material."  The three documents are:

1. A printout of the docket for Rutherford's case, which contains two entries that show that he was released from detention in the company of a law enforcement officer to be transported to his home to visit with his family for approximately five hours on November 27, 1980 and December 29, 1980.  (Def.'s PCRA Ex. RR at 2);

2. The "Application to Transfer Case to Juvenile Court," which was filed by Rutherford's attorney and in which it was stated that one of the four reasons Rutherford's case should be transferred is that:

    (b) The applicant's medical and psychiatric condition require that, if convicted, he not be confined to custody along with adults and that he be given adequate opportunity for medical and psychiatric treatment[.]

    (Id. at 21);[8] and,

3. A letter dated October 17, 1980, from one of the prosecutors (Timothy J. Geary, Esq.) to Rutherford's attorney, in which Geary wrote: "[i]t is my feeling that a disposition of this case prior to the completion" of Lesko and Travaglia's trial "would be too risky from a prosecution standpoint….  The trial in the matter of the homicide of Leonard Miller will commence on 5 January 1981…  Hopefully, this time the trial will be completed and afterwards we can dispose of Ricky's case."  (Id. at 14).

### Discussion

The task before this Court is to consider whether the cumulative impact of the above-

described suppressed evidence was material.  Kyles v. Whitley, 514 U.S. 419, 436 (1995)

(the materiality of suppressed evidence must be "considered collectively, not item by item.")

Evidence is material if there is a reasonable probability that the outcome of the trial would have

---

[8] The other reasons listed in the application were:  "(a) The applicant's status as a juvenile requires, in the interests of the applicant, his family, and society in general, that he be shielded from publicity; … (c) the applicant's civil rights be preserved as well as the protection against the use of adjudication against him in subsequent proceedings; and (d) the applicant be protected against disqualification for public and private employment."  (Def.'s PCRA Ex. RR at 21).

been different had the evidence been disclosed to the defense.  See, e.g., Bagley, 473 U.S. at 678.

The Supreme Court has explained:

> Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant).  [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."  Bagley, 473 U.S. at 678[.]

Kyles, 514 U.S. at 434 (additional internal citations omitted).

Lesko has not met his burden of demonstrating that the non-disclosure of the evidence at issue was material.  His argument that the documents from Rutherford's juvenile file contain "a tremendous amount of impeachment evidence that the jury did not hear" is a vast overstatement of the import of the documents.  He maintains that the application to transfer Rutherford's case to juvenile court would have provided a factual basis to ask Rutherford about his "psychiatric condition" in order to undermine Rutherford's credibility, but he has not shown that the statement in the application was anything more than boilerplate language.  In any event, at most, as Marsh testified at the PCRA hearing, if Marsh had seen the application to transfer prior to the trial he would have made a further inquiry into whether in fact Rutherford actually had a "psychiatric condition."  (Apr. 2002 PCRA Hr'g Tr. at 27; see also id. at 166).  As Bertani acknowledged when he testified at the PCRA hearing, the mere statement made in the application to transfer would not have been enough to question Rutherford about any psychiatric condition.  (Id. at

166).  Lesko did not develop any additional evidence to show that Rutherford actually had a psychiatric condition.  Therefore, Lesko has not demonstrated that any further inquiries by Marsh, if he had seen the application to transfer, would have yielded mental health evidence about Rutherford that could have been used to impeach his testimony.

As for the docket entries in Rutherford's juvenile files that show that he received two five-hour furloughs in November and December 1980, the Court finds that the fact that the jury did not learn that information is insignificant in light of the other information that was presented to it regarding the benefit that Rutherford received in exchange for his cooperation with the prosecution and for his trial testimony.

Finally, the letter that Geary wrote to Rutherford's attorney, which Lesko contends "graphically show[s] how the Commonwealth was using a carrot and a stick to get [Rutherford] to testify," revealed nothing that was not already known or obvious to defense counsel at the time of the 1981 trial.[9]  Marsh acknowledged as much during his PCRA testimony.  (Apr. 2002 PCRA

---

[9]         In his brief [ECF No. 30] and reply [ECF No. 37], Lesko states that the October 1980 letter from Geary to Rutherford's attorney evidences that there was an "undisclosed prosecution promise" that the District Attorney was intending to drop the charges against Rutherford after Lesko and Travaglia's trial.  That is not the claim Lesko presented in the PCRA proceeding, nor is it the claim he makes in the petition that he filed with this Court.  Before the PCRA court, Lesko argued that the October 1980 letter established that the prosecution thought it was "too risky" to complete Rutherford's case before Lesko and Travaglia's trial and that it "was using a carrot and a stick to get him to testify."  (CP Doc. 367, Pet's Post-Hearing Brief at 13, 18.  See also CP Doc. 379, Pet's Post-Hearing Reply Brief at 13).  In the petition that he filed with this Court, Lesko makes the same contention:  that Geary's letter showed that "it was 'too risky' from a prosecution standpoint" to complete Rutherford's case before Lesko and Travaglia's trial.  [ECF No. 12, Petition at 12.  See also id. at 17-18].  It was not until Lesko filed his brief with this Court that he stated that there was an undisclosed agreement between Rutherford and the prosecution that it was intending to drop all charges against Rutherford after the trial.

The prosecution did not present any evidence at Rutherford's juvenile hearing, which took place in March 1981, and the court dismissed the charges against him "for the failure of the Commonwealth to present any evidence to sustain the element of the offenses charged."  (Def.'s PCRA Ex. RR at 4).  Lesko has known that fact for many years – at the very latest by the 1995 resentencing hearing during which Marsh questioned Rutherford about the outcome of his juvenile case.  (Vol. IV, Sent. Tr. at 455).  Rutherford stated that he was released immediately after his hearing because the prosecution presented no evidence at his hearing.  But, consistent with his 1981 trial testimony, Rutherford reiterated that the deal he had with the prosecution "was I would be tried as a juvenile.  There was no other deal."  (Id. at 454).  If Lesko believed that the Commonwealth presented false testimony through Rutherford at the 1995 resentencing hearing, or that Geary's letter subsequently showed that there was another *Continued on next page...*

Hr'g Tr. at 31-32).  Moreover, the jury learned that Rutherford faced the very same charges of murder and conspiracy to commit murder as Lesko and Travaglia were being tried for, that those charges were still pending against him when he testified against Lesko and Travaglia, and that he had an agreement with the District Attorney that his case would be adjudicated in juvenile court in exchange for testifying "truthfully" as a prosecution witness at the trial.  Thus, the jury was aware that Rutherford had murder and conspiracy charges hanging over his head at the time he testified, that his ability to escape being tried as an adult for the very serious crimes he faced was contingent upon the testimony he gave at the trial, and that his deal would not be "done" until he testified against Lesko and Travaglia.  Lesko has failed to convince this Court that any additional or more compelling points could have been made to the jury if Geary's letter to Rutherford's attorney had been disclosed to the defense prior to the trial.

Lesko also overstates the significance of the two suppressed documents related to Montgomery.  The impeachment material available in the Steffee report was cumulative of that which was contained in the January 4 and January 5, 1980 police reports, which defense counsel had prior to the trial.  Lesko's efforts to downplay the significance of the January 4 and January 5, 1980 police reports after the Commonwealth pointed out their significance in its answer are completely unavailing.  Those two police reports could have been used to impeach Montgomery about the discrepancy between his initial statements to the police and his trial testimony, since they show that when the police initially interviewed Montgomery, he did not indicate that he knew anything about the murders Lesko and Travaglia were suspected of committing.  Those police reports also could have been used to demonstrate that Montgomery did not reveal the

---

agreement between Rutherford and the District Attorney that was not disclosed to the defense, he was required to make those actual claims to the state court before he could litigate them here.

incriminating statements that, in his trial testimony, he attributed to Lesko and Travaglia until after he entered into his agreement with the District Attorney. As discussed below, it may have been that defense counsel deliberately steered clear of discussing certain topics with Montgomery, even when that meant not utilizing available impeachment evidence. Neither Marsh nor Bertani used the January 4, 1980 or January 5, 1980 police reports to impeach Montgomery's trial testimony about the discrepancy between his initial statements to the police and his trial testimony. Since defense counsel did not utilize those police reports to show that Montgomery's initial statements to police were different from his trial testimony, Lesko has not convinced this Court that he would have utilized the Steffee report if it had been disclosed to him.

Similarly, assuming that the prosecution did not provide to defense counsel Montgomery's "Agreement and Statement of Intent," the information contained in that document was cumulative of information defense counsel possessed. Marsh had the information he needed to ask Montgomery about his deal with the District Attorney but did not do so. The agreement was discussed at the suppression hearing and also at the March 26, 1980 proceeding, which had been transcribed and given to defense counsel. Under these circumstances, Marsh did not require a physical copy of the "Agreement and Statement of Intent" in order to ask Montgomery about his deal. There is no reason for this Court to conclude that if defense counsel had asked Montgomery about his agreement that Montgomery would have denied its existence or what its terms were. As discussed previously, he was asked about the agreement at the suppression hearing and testified about it. Lesko simply has not demonstrated why the fact that defense counsel may not have had a physical copy of the written "Agreement and Statement of Intent" had a material impact on his trial. The issue with respect to Montgomery's agreement with the

District Attorney is not whether Marsh possessed the information he needed to ask Montgomery about it. He clearly did. The real issue is whether Marsh provided Lesko with constitutionally deficient representation for failing to ask Montgomery about it. That issue will be discussed in Lesko's related ineffective assistance of counsel claim.

The Court also concludes that Lesko has not shown that the suppression of either the Steffee report or Montgomery's "Agreement and Statement of Intent" was material for the alternative reason that Montgomery's testimony for the prosecution was not as central to the prosecution's first-degree murder case as Lesko argues it was. The statement that Lesko made to Montgomery hours after Officer Miller was killed was just one of the many pieces of evidence that the prosecution relied upon to show that Lesko possessed the intent to kill. It was not the key or even one of the most important pieces of evidence, and the other evidence of intent to kill was not dependent on Montgomery's testimony. Therefore, if defense counsel had been able to impeach Montgomery's testimony, the remainder of the evidence presented to show that Lesko had the intent to kill Officer Miller would have remained unaltered.

Based upon all of the foregoing, the Court concludes that Lesko has not met his burden of demonstrating that the suppression of the evidence in question in Claim I was material. He has not shown that there is a reasonable probability that the outcome of the trial would have been different had the documents at issue been disclosed to the defense. Therefore, Lesko's <u>Brady</u> claim is denied.

### Ineffective Assistance of Counsel Claim

In the related Sixth Amendment claim, Lesko contends that Marsh provided him with ineffective assistance because he did not uncover other evidence or pursue other testimony that

would have impeached Montgomery's trial testimony. First, Lesko faults Marsh with failing to cross-examine Montgomery about the fact that he was suspected to have committed robberies with the defendants and that he avoided prosecution on them by entering into his agreement with the District Attorney. Second, Lesko contends that if Marsh had secured Montgomery's testimony about the agreement, he could have requested and received the standard instruction advising the jury to consider whether a "witness ha[s] any interest in the outcome of the case, bias prejudice or other motive that might affect his testimony." Third, Lesko contends that Marsh did not interview Montgomery and if he had, he would have learned and elicited testimony from him that Travaglia knew and did not like Officer Miller, which could have been used to show that Travaglia had a distinct motive to shoot him.

This portion of Claim I claim calls for a straightforward application of the test for ineffective assistance of counsel set forth in Strickland v. Washington, 466 U.S. 668 (1984). Strickland recognized that the Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence" entails that defendants are entitled to be represented by an attorney who meets at least a minimal standard of competence.[10] Id. at 685-87. "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance[.]" Burt v. Titlow, — U.S. —, 134 S. Ct. 10, 17 (2013) (quoting Strickland, 466 U.S. at 690, 687).

---

[10] Since the Fourteenth Amendment guarantees a criminal defendant pursuing a first appeal as of right certain "minimum safeguards necessary to make that appeal 'adequate and effective,'" Evitts v. Lucey, 469 U.S. 387, 392 (1985) (quoting Griffin v. Illinois, 351 U.S. 12, 20 (1956)), including the right to the effective assistance of counsel, id. at 396, the ineffective assistance of counsel standard of Strickland applies to a claim that direct appeal counsel was ineffective. See Smith v. Robbins, 528 U.S. 259, 285 (2000); United States v. Cross, 308 F.3d 308, 315 (3d Cir. 2002).

To prevail on a claim of ineffective assistance under Strickland, Lesko has the burden of establishing that his defense counsel's representation fell below an objective standard of reasonableness."  466 U.S. at 688.  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  Id. at 687.  Importantly, the Supreme Court has emphasized that "counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment[.]'"  Titlow, 134 S. Ct. at 17 (quoting Strickland, 466 U.S. at 690).  As the Supreme Court observed in Strickland:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

466 U.S. at 689 (internal citations and quotations omitted).  Richter, 131 S. Ct. at 787 ("A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.") (quoting Strickland, 466 U.S. at 689).

The Supreme Court also has instructed that "[i]t should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'"  Titlow, 134 S. Ct. at 17 (quoting Strickland, 466 U.S. at 689).  It also has advised:

"Surmounting Strickland's high bar is never an easy task."  Padilla v. Kentucky, 559 U.S. 356, —, 130 S. Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S., at 689-690, 104 S. Ct. 2052.  Even under de novo review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.

Richter, 131 S. Ct. at 788.

Strickland also requires that Lesko demonstrate that he was prejudiced by his defense counsel's alleged deficient performance.[11]  This places the burden on him to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  As the Third Circuit has explained:

[The petitioner] "need not show that counsel's deficient performance 'more likely than not altered the outcome of the case' – rather, he must show only 'a probability sufficient to undermine confidence in the outcome.'"  Jacobs v. Horn, 395 F.3d 92, 105 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 693-94).  On the other hand, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding."  Harrington [v. Richter], 131 S. Ct. at 787 (citing Strickland, 466 U.S. at 693).  Counsel's errors must be "so serious as to deprive the defendant of a fair trial."  Id. at 787-88 (citing Strickland, 466 U.S. at 687). The likelihood of a different result must be substantial, not just conceivable.  Id.

Brown v. Wenerowicz, 663 F.3d 619, 630 (3d Cir. 2011).

---

[11]     The Supreme Court in Strickland noted that although it had discussed the performance component of an effectiveness claim prior to the prejudice component, there is no reason for an analysis of an ineffectiveness claim to proceed in that order.  466 U.S. at 697.  Consequently, if it is more efficient to dispose of an ineffectiveness claim on the ground of that the petitioner failed to meet his burden of showing prejudice, this course should be followed.  Id.

Of the three things that Lesko faults Marsh for not doing, the only one that gives pause is his failure to cross-examine Montgomery on the agreement he had with the District Attorney. Marsh was aware of the agreement. By not asking Montgomery about it, as defense counsel had cross-examined Rutherford about his, Marsh lost an opportunity to show that Montgomery avoided potential prosecution for multiple robberies in exchange for his testimony. When Marsh testified at the PCRA hearing, approximately 20 years had passed since Lesko's 1981 trial. He understandably could not remember things about the trial, even important things. Although Marsh acknowledged that the agreement could have been "helpful" for impeachment purposes (Dec. 1999 PCRA Hr'g Tr. at 24), he could not recall the scope of his cross-examination of Montgomery, let alone whether he had a strategic reason for not utilizing the agreement. (Id. at 386 (Marsh: "Not only have I forgotten things, my memory's been distorted by the passage of time on some things."); id. at 398-99 (Marsh: "I can't tell you what I thought at the time. I don't remember…. I can't tell you what was on my mind at the time."); Mar. 2001 PCRA Hr'g Tr. at 83 (Marsh: "I can't remember specifically my thought at the time[.]")).

As set forth above, the Court must begin its analysis of this claim with the "strong presumption that [Marsh's] conduct fell within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, and it is Lesko burden to prove that Marsh's performance was objectively unreasonable. Under the circumstances presented here, Lesko has not met his burden. Marsh could not recall what, if any, reason he may have had to avoid discussing the agreement with Montgomery. But Bertani did not ask Montgomery a single question about the agreement either. Since both Bertani and Marsh knew about the agreement and that it protected Montgomery from being prosecuted for robberies he may have committed,

the fact the neither of them utilized such obviously impeaching material suggests to the Court that there was a reason defense counsel was avoiding the topic.[12]

The Court is "required not simply to give [Marsh] the benefit of the doubt, but to affirmatively entertain the range of possible reasons [Marsh] may have had for proceeding as [he] did." Cullen, 131 S. Ct. at 1407 (internal quotations and citations omitted). See also Richter, 131 S. Ct. at 790 ("Strickland … calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.") Did Marsh limit his cross-examination of Montgomery for fear that Montgomery might testify about how Lesko had told him prior to Officer Miller's murder that they had a contract to kill a police officer? (Mar. 2001 PCRA Hr'g Tr. at 83 (Marsh: "I can't remember specifically my thoughts on it at the time, but I certainly wouldn't have wanted that [Lesko had told Montgomery that there was a contract to kill a cop] to come in under any circumstances.")).[13] Was he fearful that Montgomery might reveal some other piece of harmful information?[14] Did he avoid the issue because Lesko may have been a suspect in at least some of the robberies in which Montgomery also had been a suspect? (Id. (Marsh: "there were plenty of reasons to limit my cross-examination of Mr. Montgomery,

---

[12]    Marsh apparently did not interview Montgomery prior to trial, but Lesko has not established that Bertani – who called Montgomery to testify as part of Travaglia's case-in-chief – did not. Since Bertani and Marsh worked together on matters that advanced each of their client's interests, Marsh may not have interviewed Montgomery prior to the trial because Bertani or one of his investigators had.

[13]    Marsh testified at the PCRA hearing that he had been concerned generally that Montgomery would discuss that Lesko told him that he had a contract to kill a police officer. (Dec. 1999 PCRA Hr'g Tr. at 397).

[14]    During a sidebar before Montgomery testified, the prosecutor warned defense counsel:

> Montgomery was involved in the sense that he knows about all of the activity…. he knows all about all of this. I again want to caution counsel, this man cannot read or barely read, and he is definitely not an extremely intelligent individual, and, you know, we've told him fifty – I don't know how many times – to be careful about what he says, but I don't want him to blurt anything out. So be careful.

(Vol. I, Trial Tr. at 463-64).

his participation in robberies with the Defendants.")). Or, did Marsh decide that he did not want to impeach Montgomery because he provided testimony favorable to each defendant's contention that there was no intent to kill Officer Miller? After all, Montgomery testified that when he met Travaglia and Lesko in the Edison Hotel after Officer Miller's murder, Travaglia told him that the shooting had been an accident. (Vol. I, Trial Tr. at 489-91). Montgomery also testified that when he saw Travaglia after Officer Miller's killing, Travaglia was high. (Id. at 498). When Bertani called Montgomery as a witness during the presentation of Travaglia's case, Montgomery testified that Travaglia was a heavy and constant drug user. (Vol. II, Trial Tr. at 796-99). Montgomery's testimony was relied upon by Travaglia to support his diminished capacity defense, and it would have worked to Lesko's benefit if the jury accepted that defense.

Once again, it is Lesko's burden to show that Marsh's performance was objectively unreasonable. He has not met his burden here. Reasonable counsel may have concluded that the harm that might occur by exploring the topic of the agreement with Montgomery outweighed the benefits that would have been gained by attempting to impeach him with it. Therefore, Lesko's claim that Marsh was ineffective for failing to question Montgomery about the fact that he avoided prosecution for robberies he was suspected of having committed by entering into his agreement with the prosecution is denied. Because Lesko has not established that Marsh was objectively unreasonable for failing to ask Montgomery about his agreement, his related claim that, if counsel had cross-examined him about the subject he also could have requested the standard jury instruction regarding the "bias, prejudice or other motive" of a witness, must fail too.

Lesko also has not met his burden of demonstrating that Marsh was deficient for failing to elicit testimony from Montgomery that Travaglia knew and disliked Officer Miller and,

42

therefore, had a personal and distinct motive to shoot him. Lesko has not shown that Marsh was not aware of that fact at the time of trial or that it was objectively unreasonable to avoid discussing the topic. As previously noted, Montgomery testified at trial that Travaglia told him that he shot Officer Miller accidentally, and that testimony was helpful to each defendant's case. Montgomery's testimony on that point was also consistent with Lesko's defense that there was no intent to kill and that Officer Miller was shot during a botched robbery attempt. Because it would have been objectively reasonable for counsel to avoid undercutting that beneficial part of Montgomery's testimony by attempting to make the conflicting point that Travaglia deliberately shot Officer Miller because he did not like him, this claim is denied.[15]

The three ineffective assistance of counsel claims that Lesko raises in Claim I also fail for the alternative reason that he has not met his burden of establishing <u>Strickland</u>'s prejudice prong. Even if Marsh had done all the things Lesko contends he should have done, Lesko has failed to establish that there is a reasonable probability that his trial would have had a different outcome. <u>Strickland</u>, 466 U.S. at 694. As explained above, Montgomery's testimony was just one of the many pieces of evidence that the prosecution introduced in its case against Lesko, and the discrediting of his testimony would not have affected the other evidence that showed he had the intent to kill.

---

[15]       Lesko also claims that he is entitled to relief as a result of the cumulative prejudice he incurred from the <u>Brady</u> violations and ineffective assistance. This claim is rejected. The Court already considered the cumulative effect the undisclosed documents had on Lesko's case and determined that it was not material under <u>Brady</u>. Since Lesko has not established that Marsh performed deficiently in his related ineffective assistance of counsel claims that he makes in Claim I, there are no other errors on the part of counsel to aggregate.

**Certificate of Appealability**

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. 28 U.S.C. § 2253 provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." Where the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Because the PCRA court granted Lesko relief on Claim I, this Court grants him a certificate of appealability on it. This Court respectfully disagrees with the PCRA court's determination that Claim I entitles Lesko to a new trial. It did not consider that the information in the suppressed evidence was cumulative of information the defense possessed prior to the 1981 trial. Also, in this Court's opinion, the PCRA court too often faulted Marsh for failing to provide a strategic reason for his actions when he testified at the PCRA hearing decades after the 1981 trial and simply could not recall details about it. That is inconsistent with the commands of the Strickland test, which presumes that counsel was effective and which places the burden on the petitioner to prove otherwise. Finally, in contrast to the PCRA court, this Court believes that Lesko places far too much significance on the two statements that Rutherford and Montgomery attributed to Lesko when they testified at the trial. Those statements were part of the prosecution's case against him, but they were not the most compelling or significant part. Focusing too much on the two statements loses sight of the much bigger picture that the prosecution presented to prove to the jury that Lesko had the intent to kill. That case consisted of the following evidence, which was not dependent upon the two statements Montgomery and

44

Rutherford attributed to Lesko: in the hours leading up to Officer Miller's murder, Lesko and Travaglia embarked on a crime spree in which they abducted, shot, beat, and killed Nicholls, but kept his silver sports car, in which they continued to travel; after they killed Nicholls they drove to Travaglia's father's home and stole a .38 caliber handgun; when Lesko discovered that the handgun only had birdshot in it, they returned to Travaglia's father's house and stole bullets for the handgun; they goaded Officer Miller into chasing them even though they were driving in the stolen car of the man they had just brutally murdered; if Officer Miller, who once again they deliberately provoked into chasing them, successfully apprehended them, the police would easily be able to link them to Nicholls's murder; therefore, when the defendants sped past Officer Miller and enticed him to chase them, they did so with the intent to kill him in the event he pulled them over.

## Claim II

The PCRA court found as fact that Lesko wanted to testify at his 1981 trial, that he discussed his desire to testify with Marsh, and that Marsh rested his case without his consent. Lesko XII, No. 681 C 1980, slip op. at 41. Relying upon these factual findings, Lesko claims that his constitutional right to testify on his own behalf was violated. In support, he argues that because the trial court knew that he wanted to testify and that Marsh had advised him against it, under the circumstances the trial court should have conducted a colloquy with Lesko to ensure that the decision not to testify was his. Lesko argues also that Marsh was ineffective because he was aware of Lesko's desire to testify, failed to apprise him of his fundamental right to testify, failed to obtain his consent when Marsh rested the defense case without calling him, and failed to

litigate at trial and on direct appeal that the trial court erred in not ensuring that the decision not to testify was a knowing, voluntary and intelligent decision made by Lesko.

Assuming for the sake of argument that the trial court violated Lesko's constitutional right to testify, this Court can grant Lesko relief only if the error was not harmless. The applicable harmless error evaluation is that which is set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), which requires that in order to grant habeas relief a federal habeas court must find that a trial error had a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637 (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)). <u>Fry v. Pliler</u>, 551 U.S. 112 (2007). And, assuming that Marsh's conduct was deficient under <u>Strickland</u>'s first prong, Lesko would be entitled to relief on his related ineffective assistance of counsel claim only if he met his burden of demonstrating that he was prejudiced.

Lesko testified at the PCRA hearing. He stated that he wanted to testify at the 1981 trial so that he could refute only two things: (1) that he told Rutherford "get down, this might be a shooting gallery"; and, (2) that he told Montgomery that "I wanted to [shoot a cop.]" (Apr. 2002 PCRA Hr'g Tr. at 117-19). Lesko did not state that he had any other testimony that he would have provided to promote his defense or refute any of the other evidence introduced to show his intent to kill, including the details of the horrific crime spree the defendants embarked upon when they abducted Nicholls, then murdered him, then stole the handgun that would subsequently be used to kill Officer Miller, then stole bullets that could be used with the gun, and then goaded Officer Miller into chasing them even though if he was able to catch them they would be easily linked to the murder of Nicholls. As this Court already has explained, even if Lesko was able to persuade the jury to conclude that he did not make the two statements that

Montgomery and Rutherford had attributed to him, the other evidence of intent to kill would not have been affected.

Moreover, as the Commonwealth argues, there is no reason to believe that Lesko would have been able to advance his defense in any way if he took the stand. Lesko was fortunate because he was able to speak to the jury through the admission of the heavily-redacted statement that he gave to the police after his arrest. Through that statement, the jury heard Lesko explanation that he, Travaglia and Rutherford only intended to commit a robbery, and not the murder of a police officer. Although Marsh no doubt wisely counseled Lesko not to testify, even if his constitutional right to testify was violated, that error did not have a "substantial and injurious effect or influence" on the jury's verdicts and, therefore, was harmless under <u>Brecht</u>. And, even if Marsh was deficient for failing to do all of the things Lesko claims he should have done, Lesko has not met his burden of showing that he was prejudiced under <u>Strickland</u>. For all of these reasons, Claim II is denied.

Because the PCRA court granted Lesko relief on Claim II, the Court will grant him a certificate of appealability on it. Once again, this Court respectfully disagrees with the PCRA court's resolution of this claim.

### Claim III

Lesko argues that Marsh was ineffective for not objecting when the prosecutor "crossed the line of proper" advocacy and injected prejudicial and extraneous considerations into the case. The first alleged improper comment that Lesko points to is the following one made by the prosecutor in the opening statement:

> We will call witnesses from Apollo, Pennsylvania, and they will tell you a little
> bit about Leonard Clifford Miller. The Borough of Apollo was the municipality
> that Leonard Clifford Miller served as a police officer. They will tell you about
> his dreams and ambitions being fulfilled by his appointment to a position of a full-
> time police officer only three days before his death.

(Vol. I, Trial Tr. at 31). Lesko argues that these few statements from the prosecutor improperly

elicited sympathy towards Officer Miller and was non-probative of matters the jury would be

tasked with deciding and, therefore, Marsh should have objected. Lesko's argument as no merit

whatsoever. The prosecutor's comments did not interject unfairness into Lesko's trial and

reasonable counsel could have concluded that objecting to them would have reflected poorly

upon the defendant.

The second alleged improper comment that Lesko faults Marsh for failing to object to

was made by the prosecutor in the closing statement:

> Now, the Commonwealth is under no obligation to dovetail all of the statements
> that were made by all of the witnesses. That is why there is generally always an
> appeal to your common sense. The Commonwealth presented approximately
> twenty-four witnesses. The defense presented six witnesses. And in many
> instances, there were inconsistencies in the testimony of those various witnesses,
> particularly in regard to the expert witnesses.

(Vol. II, Trial Tr. at 1223). Lesko argues that Marsh should have objected to this comment

because the prosecutor made an unfair comparison between the number of witnesses the

prosecution and the defendants presented and infringed upon the right of a defendant not to call

any witnesses at all. This contention likewise has no merit. A fair reading of the challenged

statement does not support Lesko's characterization of it. The prosecutor was not suggesting that

the jury should find that the prosecution had the stronger case because it presented more

witnesses. Read in the proper context, the prosecutor merely was commenting upon the large

number of witnesses who testified and acknowledging the difficulty the jury faced in processing the volume of information that was offered by so many, and sometimes conflicting, witnesses.

Next, Lesko faults Marsh for not objecting to the several instances in which the prosecution "employed Biblical arguments."  The prosecutor remarked in the opening statement: "The rule of conduct which the people of Pennsylvania are charging Michael Travaglia and John Lesko with violating is simply this:  Thou shalt not kill." (Vol. I, Trial Tr. at 29).  Bertani objected, but the trial court overruled the objection.  (Id. at 38-41).  In his closing statement, Bertani revisited the subject when he commented that nobody disagrees that "[t]hou shall not kill," but that the "rest of it" is "vengeance is mine saith the Lord."  (Vol. II, Trial Tr. at 1195-96).  Bertani's remark prompted the prosecutor to point out that Bertani had misquoted the verse ("An eye for an eye, tooth for a tooth: vengeance is mine saith the Lord"), and that he likely "was referring to another section of the Bible ... wherein the Lord in talking to his people, says vengeance is mine.  I will repay you.  That is Chapter 12 of Roman[s.]."  (Id. at 1221-22).

Even if the Court assumes that Lesko is correct when he asserts that arguments based upon biblical scripture clearly are improper, he has not met his burden of demonstrating that he was prejudiced by Marsh's failure to object to any of the above-quoted statements, request a corrective instruction, or present this issue throughout the appellate process.  The trial court properly charged the jury on Pennsylvania law and how it should apply it during its deliberations.  Lesko had not shown that there is a reasonable probability that the outcome of his trial would have been different but for Marsh's failure to address the biblical references in the manner Lesko argues he should have.

Lesko's final contention in Claim III is that Marsh was ineffective for failing to object when the prosecution solicited improper and prejudicial comments about his lack of remorse

49

during his police interview. In support, he directs the Court to the direct examination of Detective Amity, during which the prosecutor asked whether Lesko "ever expressed any remorse or regret or sorrow about what happened?" Detective Amity replied: "No, ma'am." (Vol. I, Trial Tr. at 622). Lesko argues that Marsh should have objected to this testimony because it was improper and inflamed the jury's passions by portraying him as unrepentant.

Aside from Detective Amity's single comment, Lesko does not direct the Court to another witness who testified about his lack of remorse. Nor does Lesko direct the Court to any instance in which the prosecutor referenced Detective Amity testimony that Lesko lacked remorse. Under the circumstances, the Court concludes that Lesko has not shown that he was prejudiced. Even if the Court accepts his contention that Marsh was deficient in failing to object to that single portion of Detective Amity's testimony or request a curative instruction, Lesko has failed to satisfy his burden of demonstrating that there is a reasonable probability that the outcome of his trial would have been any different.[16]

---

[16]      Lesko points out that in his first federal habeas proceeding, the Third Circuit held that he was entitled to a new sentencing hearing because, *inter alia*, the prosecutor had stated during his closing argument in the 1981 sentencing hearing that Lesko, who testified at the sentencing hearing, "didn't even have the common decency to say I'm sorry for what I did. I don't want you to put me to death, but I'm not even going to say that I'm sorry." Lesko VIII, 925 F.2d at 1540. As noted previously, the Third Circuit held that the prosecutor's remarks about Lesko's failure to express remorse constituted a comment on his assertion of his Fifth Amendment privilege against self-incrimination, in violation of the rule of Griffin v. California, 380 U.S. 609 (1965), forbidding such comment. The decision in Lesko VIII does not advance Lesko's argument that he is entitled to guilt-phase relief. First, Lesko has not directed this Court to an instance in which the prosecutor commented about Lesko's lack of remorse during its arguments to the jury at the guilt phase of the trial. The facts of this claim simply are much different than the claim upon which Lesko received relief in Lesko VIII.

     Second, the Third Circuit's decision in Lesko VIII is distinguishable for another very important reason. When the Third Circuit in Lesko VIII applied the harmless error test, it applied the test set forth in Chapman v. California, 386 U.S. 18, 24 (1967). Therefore, and significantly, it placed the burden on the Commonwealth to "demonstrate[], beyond a reasonable doubt, that the [prosecutor's] remarks did not change the jury's exercise of discretion in choosing between life imprisonment and death," id. at 1546, and held that the Commonwealth did not meet its burden. The Supreme Court has subsequently made clear that Chapman applies on cases being reviewed on direct appeal, and that the harmless error test that must be applied in a federal habeas case is "the more forgiving" one set forth in Brecht. Brecht, 507 U.S. at 637-39; Fry, 551 U.S. at 116. As set forth above, Brecht provides that an error is harmless unless it "'had a substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. at 637 (quoting Kotteakos, 328 U.S. at 776).

Based upon all of the foregoing, Claim III is denied.  Because jurists of reason would not find it debatable that Claim III lacks merit, a certificate of appealability is denied.

**Claim IV**

In its instructions to the jury, the trial court stated:

> Our law requires that prior to your deliberation, I inform you of the penalties of the various degrees of murder.
>
> A person who is convicted of murder in the first degree shall be sentenced to life imprisonment or death.  A person who is convicted of murder of the second degree, the sentence is life imprisonment.  A person who is convicted of murder of the third degree is subject to a maximum sentence of not less than ten years, nor more than twenty years in an appropriate state correctional institution.  In murder of the third degree, the court may impose the maximum sentence or any lesser sentence, which, in its discretion, the court deems appropriate.

(Vol. II, Trial Tr. at 1289-90).

The trial court was wrong when it stated that the law required that this instruction be given.  Although state law had once required that the jury be told the penalties for murder before their deliberations on guilt, in 1978 the state statute at issue was amended and that express requirement was deleted.  Lesko argues that the trial court's error in giving the instruction was so severe that it rose to the level of a due process violation and that Marsh was ineffective for failing to object both on state law and due process grounds.

Lesko argument is unconvincing.  The instruction advised the jury that if it found Lesko, who was not the triggerman, guilty of first-degree murder, he potentially could be sentenced to death.  Objectively reasonable counsel could have concluded that the instruction might benefit Lesko and sway some jurors against a first-degree murder verdict.  The instruction also advised the jury that if it found Lesko guilty of second-degree murder, as Lesko urged it to do, he would

still spend the rest of his life in prison. For these reasons, Lesko has not established that Marsh's conduct fell below an objective standard of reasonableness for failing to object to the instruction, nor has he established that he was prejudiced. Therefore, Claim IV is denied. Because jurists of reason would not find it debatable that this claim lacks merit, a certificate of appealability is denied.

## Claim XX

Lesko contends that he is entitled to a new trial because Marsh failed to ask the court to give a cautionary instruction to the jury with respect to its consideration of the instances of his prior uncharged bad acts. According to Lesko, the uncharged bad acts evidence introduced at his trial were illegal use of drugs; corrupting a minor (Rutherford); committing crimes of dishonesty (stealing from Travaglia's father's garage and truck); associating with criminal elements (living in the Edison Hotel, which had a reputation for being a hangout for prostitutes and drug users); and, possessing stolen property (Nicholls's stolen car).

Lesko is correct that when bad acts evidence is admissible, it is admissible only for a limited purpose and that the court should provide a cautionary instruction on the limited purposes for which the evidence was being admitted if one is requested. Marsh did not request the instruction, and the trial court did not give one. On direct appeal, it is reversible error for the trial court to fail to give a cautionary instruction when one is requested, unless the appellate court finds that the error was harmless. See, e.g., Commonwealth v. Page, 965 A.2d 1212, 1222-23 (Pa. Super. 2009) (citing Commonwealth v. Hutchinson, 811 A.2d 556, 561 (Pa. 2002), which cited Commonwealth v. Robinson, 721 A.2d 344, 350 (Pa. 1999)). In federal habeas, however, Lesko is entitled to relief on this Strickland claim only if he demonstrates that there is a

reasonable probability that the outcome of his trial would have been different had Marsh requested a limiting instruction. He has not met his burden.

Lesko strains credulity when he argues that the jury needed to be instructed as to how to properly consider evidence that he corrupted a minor or lived at the Edison Hotel. Since Lesko wanted the jury to consider the defendants' drug use because it advanced Travaglia's diminished capacity defense, he was not prejudiced by the absence of a limiting instruction regarding it. As for the other evidence at issue here, it was properly introduced to explain the events that transpired leading up to Officer Miller's murder and Lesko simply has not shown that he was prejudiced, under the circumstances, by Marsh's failure to request a cautionary instruction regarding the limited purpose for which the jury could consider it. Therefore, Claim XX is denied. Because jurists of reason would not find it debatable that this claim lacks merit, a certificate of appealability is denied.

## Claim XXII

Lesko also argues that, even if none of the guilt-phase claims individually are sufficiently prejudicial to require relief, the cumulative errors and cumulative prejudice incurred requires that he be granted guilt-phase habeas relief. This claim is rejected. The Court has explained why each of Lesko's guilt-phase claims has no merit, and he has failed to demonstrate that any errors that may have occurred when considered cumulatively entitle him to habeas relief. No trial is perfect, and although Lesko is highly critical of Marsh's representation of him, of the prosecution's conduct, and frames every potential error by the trial court as one of constitutional magnitude, a review of his guilt-phase trial (and, indeed, his 1995 resentencing) demonstrates

that all involved strove to ensure that he had a fundamentally fair trial and one that comported with the requirements of the Constitution. They accomplished their goal.

The guilt-phase portion of Claim XXII is denied. Because jurists of reason would not find it debatable that this claim lacks merit, a certificate of appealability is denied.

**D.**     **1995 Re-Sentencing Hearing**

Lesko's seven-day resentencing hearing trial began on February 9, 1995, after the jury was selected, and concluded on February 17, 1995. The prosecution had the burden of proving beyond a reasonable doubt that at least one statutorily-defined aggravating circumstance accompanied the murder. Lesko could introduce, and the jury could consider, mitigating evidence. Mitigating circumstances had to be proven by a preponderance of the evidence. The jury could impose the death penalty only if it found that the statutorily-defined aggravating circumstances proven by the Commonwealth outweighed any mitigating circumstances proven by Lesko. See 42 Pa. Cons. Stat. § 9711.

The prosecution pursued the following four aggravating factors: (1) Lesko had been convicted of another federal or state offense for which a sentence of life imprisonment or death was imposable (the murder of Peter Levato), id., § 9711(d)(10); (2) Lesko had been convicted of another federal or state offense for which a sentence of life imprisonment or death was imposable (the murder Marlene Sue Newcomer), id., § 9711(d)(10); (3) the victim, Officer Miller, was a police officer killed in the performance of his duties, id., § 9711(d)(1); and, (4) Lesko had a significant history of felony convictions involving the use or threat of violence to the person (the murders of Levato and Newcomer and the criminal conspiracy to commit homicide in both of those cases). (CP Doc. 207). In order to establish these aggravating

circumstances, the prosecution introduced evidence regarding Lesko and Travaglia's gruesome, brutal and senseless murders of Levato (Vol. III, Sent. Tr. at 46-62) and Newcomer (id. at 128-52), which occurred just days before they murdered Officer Miller.  The prosecution also introduced evidence to provide the necessary background regarding the crime for which the jury was considering the appropriate penalty – the murder of Officer Miller.  Therefore, witnesses who testified at the 1981 trial were called at this resentencing trial too, including Rutherford, Montgomery and Detective Amity.

Lesko urged the jury to find the following mitigating circumstances:  (1) he was under the influence of extreme mental or emotional disturbance, 42 Pa. Cons. Stat. § 9711(e)(2); (2) his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, id., § 9711(e)(3); (3) his youthful age (21) at the time of the crime, id., § 9711(e)(4); (4) his participation in Officer Miller's murder "was relatively minor," id., § 9711(e)(7); and, (5) any other evidence of mitigation concerning his character and his record or the circumstances of the offense, id., § 9711(e)(8) (commonly referred to as the "catch all" mitigating factor).  (CP Doc. 207).

In support of his mitigation case, Lesko presented the testimony of Lois Nardone, an expert in the field of forensic social work (Vol. V, Sent. Tr. at 555-618);[17] Dr. Herbert I. Levit,

---

[17]     Nardone explained that in preparation for her testimony she interviewed:  Lesko "a number of times"; his mother, Mary Ann Fedorko; his grandmother, Anna Ridge; his two sisters, Kim Kline and Mathilda Johns; his two brothers, Michael and Joseph; his aunt, Anna Marie Aikman; a teacher from Holy Family named Father Larry Smith; an individual that was at the time a social worker or director of the Holy Family Institute, Sister Mary Rose; and, the Chaplin from the prison where Lesko was confined.  Nardone also explained that she "looked at records from the Allegheny County Juvenile Court, South Hills Health Systems, United States Marine Corps, Duquesne Elementary School, West Mifflin School ... Taylor Allderdice, [and] Homestead Hospital."  She stated that she looked at "a letter I received from Holy Family … Allegheny County Youth Services records," as well as some transcripts from proceedings in which Lesko's ex-girlfriend, Patricia Hess, her mother, and his aunt, Anna Marie, testified.  (Vol. V, Sent. Tr. at 566-67).  In their answer, the Commonwealth provides a detailed summary of Nardone's testimony.  [ECF No. 35, Answer at 60-65].
*Continued on next page...*

an expert in the field of clinical and forensic psychology (Vol. VI, Sent. Tr. at 677-724);[18] Lesko's aunt, Anna Marie Aikman (id. at 739-50); and his brother, Michael (id. at 751-66). The testimony of all of these witnesses consistently described Lesko's very difficult upbringing, which was marred by severe neglect, abuse, poverty, and sexual molestation.

Dr. Levit also testified that at the time Lesko participated in the murder of Officer Lesko, he had borderline personality disorder (id. at 693, 700-04); showed signs of "impulsiveness, internalized hostility, [and] depression" (id. at 696); had the emotional status of an early teen; (id. at 702, 704-05); suffered from polysubstance abuse that impaired his functioning (id. at 703-04); and had a disorder that "reduced his ability to appreciate his behavior and its consequences and conform" his conduct to the law (id. at 706).

Lesko testified in support of his mitigation case. (Vol. VII, Sent. Tr. at 22-134). Consistent with the testimony of the other defense witnesses, he provided details of his difficult childhood, including his own molestation and institutionalization, and his brother Joseph's molestation. (Id. at 22-49). Lesko also discussed his disturbed state of mind during the killing spree, how he had changed significantly during his time in prison, and how sorry he was about the crimes he committed. (Id. at 49-67).

When she testified at the PCRA hearing, Nardone stated that the one individual that she did not personally interview (although she may have spoken with her during the course of collecting documents) was Lesko's mother, Mary Ann Fedorko, because she had died by the time Nardone was assigned by Alfonso Associates to be Lesko's case worker. (Mar. 2001 PCRA Hr'g Tr. at 238. See also id. at 228, 232-37). Therefore, in preparing for her 1995 resentencing testimony, Nardone explained, she had relied upon the information obtained by another member of the staff who had interviewed Fedorko. (Id. at 238-39).

[18] Dr. Levit testified that he gave Lesko a "series of psychological tests" on February 6, 1995. Those tests were "the selected sub-test of the Wechsler Intelligence Scale, Revised[,]" the "Bender Visual Motor Gestalt Test, human figure drawings, and the Rorschach Test." (Vol. VI, Sent. Tr. at 687). Dr. Levit stated that one of the purposes of the Bender Visual Motor Gestalt Test "is to see whether or not there is any organic brain damage[.]" (Id. at 694). Although the test revealed other issues Lesko had, Dr. Levit did not testify that he found any evidence of organic brain damage. (See id. at 696-97).
Dr. Levit stated that prior to the examination he "reviewed a lengthy forensic sociology report" by Alfonso Associates. He also spoke to Michael Lesko and Father Larry Smith. (Id. at 685-86).

Finally, Hamid Abdul, a chaplain at SCI Graterford, testified as part of Lesko's mitigation case. (Vol. V, Sent. Tr. at 618-74). He described Lesko as repentant, non-violent, religious and as someone who had a positive impact on other inmates.

In announcing their verdict, the jurors explained that they unanimously found each of the four aggravating factors that the prosecution urged it to find. The mitigating factors found by one or more of the jurors were: (1) that Lesko was under the influence of extreme mental or emotional disturbance; (2) his service to others on death row; (3) his horrible childhood; and (4) his character has changed over the last 15 years of his confinement. The jury concluded that the aggravating circumstances outweighed the mitigating circumstances and unanimously sentenced Lesko to death. (CP Doc. 207).

### Standard of Review of Lesko's Sentencing-Phase Claims

Lesko raises numerous claims in which he challenges his 1995 resentencing hearing and the jury's verdict of death. Unlike Lesko's guilt-phase claims, the Pennsylvania Supreme Court adjudicated Lesko's sentencing-phase claims on the merits. As a result, AEDPA's standard of review applies to this Court's review of them and, therefore, the only questions before this Court is whether Lesko has established that the state court's adjudication of the claim in question resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

The limitation imposed by AEDPA on this Court's review of Lesko's sentencing-phase claims is extremely significant. AEDPA "imposes a highly deferential standard for reviewing

claims of legal error by state courts[.]"  <u>Titlow</u>, 134 S. Ct. at 15.  Because this Court must apply it to Lesko's sentencing-phase claims, it means that this Court is not considering the same issue that the Pennsylvania Supreme Court was when it ruled on each of Lesko's claims.  <u>See</u>, <u>e.g.</u>, <u>Richter</u>, 131 S. Ct. at 785 ("The pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable.  This is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard[,]" which was the question before the state court.); <u>id.</u> at 788 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard."); <u>Rountree v. Balicki</u>, 640 F.3d 530, 540 (3d Cir. 2011) ("Rountree's second <u>Strickland</u> burden in the state court was to show that his counsel's unprofessional conduct prejudiced his case.  But his burden before us is greater:  under AEDPA, the question is not whether a federal court believes the state court's determination was incorrect, but whether that determination was unreasonable – a substantially higher threshold.") (internal quotations and citations omitted).  "The petitioner carries the burden of proof."  <u>Cullen</u>, 131 S. Ct. at 1398 (internal quotations and citations omitted).

Importantly, "'clearly established Federal law' for purposes of § 2254(d)(1) includes only 'the holdings, as opposed to the dicta, **of [the Supreme] Court's decisions**.'"  <u>White v. Woodall</u>, — U.S. — , 134 S. Ct. 1697, 1702 (2014) (emphasis added) (quoting <u>Howes v. Fields</u>, 565 U.S. —, 132 S. Ct. 1181, 1187 (2012), which quoted <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000)).  The Supreme Court "has repeatedly emphasized" that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court'" under § 2254(d)(1).  <u>Glebe v. Frost</u>, — U.S. — , 135 S. Ct. 429, 431 (2014) (per curiam) (citing <u>Lopez v. Smith</u>, 574 U.S. — , 135 S. Ct. 1, 4-5 (2014) (per curiam)).  In addition, "Circuit precedent cannot 'refine or

sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced."' Woodall, 135 S. Ct. at 4 (quoting Marshall v. Rodgers, 569 U.S. — , 133 S. Ct. 1446, 1451 (2013) (per curiam)). "Of course, a state court's resolution of a question that the Supreme Court has not resolved can be neither contrary to, nor an unreasonable application of, the [Supreme] Court's precedent." Rountree, 640 F.3d at 537 (citing Kane v. Garcia Espitia, 546 U.S. 9, 10-11 (2005)).

A state court decision is "contrary to … clearly established Federal law, as determined by the Supreme Court" "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," Williams, 529 U.S. at 405, or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent," id. at 406. Few adjudications by state courts fall within § 2254(d)(1)'s "contrary to" clause.

Most state court's adjudications must be evaluated under § 2254(d)(1)'s "unreasonable application" clause. "If the state court decision identifies the correct governing legal principle in existence at the time [such as the Strickland standard], a federal court must assess whether the decision unreasonably applies that principle to the facts of the prisoner's case." Cullen, 131 S. Ct. at 1399 (quotation marks omitted). The Supreme Court has advised:

> It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. See [Lockyer v. Andrade, 538 U.S. 63, 75 (2003)].
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. Cf. Felker v. Turpin, 518 U.S. 651, 664 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). **It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther…. As a condition for obtaining habeas corpus from a federal court, a state**

**prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.**

Richter, 131 S. Ct. at 786-87 (parallel citations omitted) (emphasis added). And as the Supreme Court recently has explained when it rejected "[t]he unreasonable-refusal-to-extend concept" advanced by a federal habeas petitioner:

Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. See Scheidegger, Habeas Corpus, Relitigation, and the Legislative Power, 98 Colum. L. Rev. 888, 949 (1998). Thus, "if a habeas court must extend a rationale before it can apply to the facts at hand," then by definition the rationale was not "clearly established at the time of the state-court decision." Yarborough, 541 U.S., at 666, 124 S. Ct. 2140. AEDPA's carefully constructed framework "would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law." Ibid.
   This is not to say that § 2254(d)(1) requires an "'identical factual pattern before a legal rule must be applied.'" Panetti v. Quarterman, 551 U.S. 930, 953, 127 S. Ct. 2842, 168 L.Ed.2d 662 (2007). To the contrary, state courts must reasonably apply the rules "squarely established" by this Court's holdings to the facts of each case. Knowles v. Mirzayance, 556 U.S. 111, 122, 129 S. Ct. 1411, 173 L.Ed.2d 251 (2009). "[T]he difference between applying a rule and extending it is not always clear," but "[c]ertain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." Yarborough, *supra*, at 666, 124 S. Ct. 2140. **The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no "fairminded disagreement" on the question, Harrington [v. Richter], 562 U.S., at — , 131 S. Ct., at 787.**

Woodall, 134 S. Ct. at 1706-07 (emphasis added).

Finally, the test for § 2254(d)(2)'s "unreasonable determination of facts" clause:

is whether the petitioner has demonstrated by "clear and convincing evidence," § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record. See Rice v. Collins, 546 U.S. 333, 338-339 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the

> burden of rebutting the presumption by 'clear and convincing evidence.'")
> (quoting § 2254(e)(1)) (citing <u>Miller-El v. Dretke</u>, 545 U.S. 231, 240 (2005)); <u>see also</u> <u>Simmons v. Beard</u>, 590 F.3d 223, 231 (3d Cir. 2009) ("Under the § 2254 standard, a district court is bound to presume that the state court's factual findings are correct, with the burden on the petitioner to rebut those findings by clear and convincing evidence."). Importantly, the evidence against which a federal court measures the reasonableness of the state court's factual findings is the record evidence at the time of the state court's adjudication. <u>Cullen v. Pinholster</u>, — U.S. — [ ], 131 S. Ct. 1388, 1401-03 (2011).

<u>Rountree</u>, 640 F.3d at 537-38 (parallel citations omitted). More recently, the Supreme Court has explained that "[w]e have not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1) …. For present purposes, it is enough to reiterate 'that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" <u>Titlow</u>, 134 S. Ct. at 15 (quoting <u>Wood v. Allen</u>, 558 U.S. 290, 301 (2010)).

## Claim V

The first sentencing-phase claim that this Court will review is Claim V, in which Lesko contends that his defense counsel (particularly Marsh) provided him with ineffective assistance at the 1995 resentencing because they failed to present available and compelling mitigating evidence.

### Background

Lesko faults his defense counsel for failing to present expert evidence of his organic brain damage. To show what type of expert testimony defense counsel should have introduced at the 1995 resentencing hearing, Lesko presented at the PCRA hearing the testimony of Dr. Barry Brown, a neuropsychologist. On October 28, 1999, Dr. Crown administered a complete

neuropsychological test battery to Lesko. (Mar. 2001 PCRA Hr'g Tr. at 420). Dr. Crown concluded to a reasonable degree of neuropsychological certainty that Lesko has organic brain damage. (Id. at 389-401, 422). He testified at the PCRA hearing that the type of brain damage Lesko has "manifests itself through difficulties in judgment, reasoning, concentration, mental flexibility, variability of mood, … impulsivity, and difficulties in self-assessment." (Id. at 392). Dr. Crown determined that Lesko's brain damage constitutes an extreme mental and emotional disturbance (the mitigating circumstance at 42 Pa. Cons. Stat. § 9711(e)(2) which at least one of Lesko's jurors found) and a significant impairment in his ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law (the mitigating circumstance at § 9711(e)(3), which none of Lesko's jurors found). (Id. at 393-94, 398-400, 407, 445).

Lesko also lists a myriad of additional things that he contends Marsh was ineffective for not doing: failing to present Children and Youth Services ("CYS") records which painted a graphic picture of the horrific childhood he endured; failing to investigate, interview, or present family members, neighbors and social services witnesses who were available and had compelling mitigating testimony to offer; failing to adequately interview and prepare the witnesses presented; failing to present mitigating evidence that had already been presented in the 1981 penalty hearing; failing to present photographic evidence that captured the impoverished and deprived circumstances in which Lesko spent his childhood; failing to secure funding and necessary records for Nardone and failing to prepare her testimony; failing to obtain critical institutional records until trial was under way; failing to follow-up on advice to obtain the services of a neuropsychologist and ignoring clear signs of brain damage; failing to obtain the assistance of Dr. Levit until the eve of trial; and failing to provide Dr. Levit with necessary institutional records and then inadequately preparing him to testify.

62

The PCRA granted Lesko relief on Claim V, and in its opinion it summarized at length the evidence Lesko introduced at the numerous PCRA hearings to support it.  Lesko XII, No. 681 C 1980, slip op. at 8-37.  The Pennsylvania Supreme Court reversed.  It held that Lesko did not establish either of Strickland's prongs.  Lesko XIII, 15 A.3d at 376-86.

In addressing Strickland's first prong, the Pennsylvania Supreme Court observed that it must presume that Marsh's performance was objectively reasonable.  Id. at 380.  It then pointed out that "this is not an instance where counsel failed to conduct any investigation and presented limited mitigating evidence; nor is it a case where counsel conducted minimal investigation and failed to uncover evidence that was immediately available to him.  Instead, it is a case where counsel undertook a reasonable investigation and presented a compelling and partly successful case in mitigation, albeit the defense case did not ultimately carry the day."  Id. at 381. In support of this conclusion, the Pennsylvania Supreme Court summarized the testimony given by Dr. Levit and Nardone at the 1995 resentencing hearing.  Id. at 381-82.

The Pennsylvania Supreme Court rejected Lesko's contention that Marsh's performance fell below Sixth Amendment standards in the manner in which he retained and supported Dr. Levit, or for failing to retain a neuropsychologist.  Id. at 382-83.  It concluded that if Dr. Levit missed "red flags" indicating that there was a possibility that Lesko had organic brain damage and that neuropsychological testing would be beneficial to Lesko's case, Dr. Levit's professional performance may be "call[ed] into question" but not Marsh's.  Id. at 382 ("we caution that, in applying Strickland, courts must be careful not to conflate the roles and professional obligations of experts and lawyers."); id. at 382 n.18 ("much of Dr. Crown's testimony at the PCRA hearing suggested that there were signs that neuropsychological testing was indicated based on the results of the tests Dr. Levit actually administered.  Dr. Levit's

alleged incompetence is a centerpiece of Lesko's claim; but, to place the expert's alleged error at

counsel's feet unmoors the analysis from Strickland.")

Importantly, the Pennsylvania Supreme Court also held in the alternative that, even if it

were to accept the PCRA court's conclusion that Lesko met his burden of establishing

Strickland's deficient performance prong, Lesko failed to establish that he was prejudiced.

In reaching this conclusion, the Pennsylvania Supreme Court emphasized the strength of the

aggravating factors that the prosecution presented at the 1995 resentencing hearing:

> … Lesko was convicted of two other murders committed the same week as this
> murder. These circumstances were unique and distinguished Lesko from the
> majority of other first-degree murderers. These murders provided the bases for
> the jury's finding of the (d)(9) (significant history of violent felony convictions)
> and (d)(10) (multiple murder) aggravators. As if this unique criminal history was
> not weighty enough, in this case, Lesko was convicted for his participation in the
> first-degree murder of an unsuspecting on-duty policeman who did nothing more
> than pull over the car in which Lesko was driving. This fact provided the jury
> with a third, powerful aggravating circumstance – that the victim was a police
> officer killed in the performance of his duties, 42 Pa. C. S. § 9711(d)(1).
>
> Furthermore, based on counsel's presentation, the jury had found that
> Lesko was under the influence of extreme mental or emotional disturbance,
> § 9711(e)(2), and it is entirely speculative how much more weight the testimony
> of a neuropsychologist such as Dr. Crown would have lent to this mitigator
> already found. Of course, it is possible that opinion testimony on brain damage
> from a neuropsychologist might persuade a juror that Lesko was unable to
> appreciate the criminality of his conduct or to conform his conduct to the
> requirements of the law under Section 9711(e)(3). But, Lesko must also show
> that there is a reasonable probability that, in the overall evaluation, at least one
> jury member would have concluded that the mitigating circumstances outweighed
> the aggravating circumstances.
>
> Faced with the aggravating circumstances where the defendant has been
> found guilty of multiple murders occurring within a one-week period, including
> the cold-blooded murder of an on-duty police officer, and the case in mitigation
> already successfully presented, we simply cannot conclude that Strickland relief
> can be premised upon the additional mitigation evidence the PCRA court found
> would have carried the day. The PCRA court failed to consider the full context of
> the case in rendering its finding as to Strickland prejudice. We do not believe
> there is a reasonable probability that further expert opinion evidence, including
> evidence of Lesko's "organic brain damage" would have resulted in a different
> weighing and different penalty verdict when the aggravating circumstances were

so patently grave, and the jury already found substantial mitigating factors, only to return with a verdict of death.  This was not an instance where the sentence of death was "only weakly supported by the record."  Instead, it was a situation where the sentence was imposed with "overwhelming record support."  <u>See</u> <u>Strickland</u>, *supra*.  Accordingly, Lesko has not proven that the outcome of the proceedings would have differed, but for counsel's supposed failure.

<u>Id.</u> at 384-85.

The Pennsylvania Supreme Court next considered Lesko's contention that there was a wealth of other mitigating evidence that he presented at the PCRA hearing (in the form of the CYS records and Nardone's and other lay witnesses' testimony) that counsel failed to investigate and present.  <u>Id.</u> at 385.  In rejecting this portion of Claim V, the Pennsylvania Supreme Court once again held that Lesko failed to meet his burden of establishing that counsel was deficient. It cited the United States Supreme Court's decision in <u>Bobby v. Van Hook</u>, 558 U.S. 4 (2009) (per curiam),[19] and concluded that, "[l]ike the High Court in [<u>Van Hook</u>], we find that Lesko cannot establish that counsel's performance was unreasonable" for failing to gather the additional mitigating evidence he presented at the PCRA hearing.  <u>Id.</u> at 386.  The Pennsylvania Supreme Court also held, in the alternative, that even if it assumed that Lesko had met <u>Strickland</u>'s first

---

[19]     In <u>Van Hook</u>, the Supreme Court overturned the United States Court of Appeals for the Sixth Circuit's grant of habeas relief to a convicted murderer who had been sentenced to death.  Van Hook, like Lesko, argued that his attorneys were ineffective during the penalty phase of his trial for failing to gather and present available mitigating evidence.  The Supreme Court found no merit in Van Hook's claim, pointing out that his defense counsel presented evidence at his penalty hearing of his traumatic childhood experiences and about his impairment (including consumption of drugs and alcohol) on the day of the crime.  <u>Van Hook</u>, 558 U.S. at 9-10.  The Supreme Court found that the scope of counsel's investigation was reasonable even though counsel did not interview all of Van Hook's relatives or the therapists who treated his parents.  <u>Id.</u> at 10-11.  It held that Van Hook's case was one, like <u>Strickland</u> itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was already in hand" fell "well within the range of professionally reasonable judgments."  <u>Id.</u> at 11-12 (quoting <u>Strickland</u>, 466 U.S. at 699).  Notably, AEDPA did not apply to Van Hook's federal habeas case.  Accordingly, unlike in this case, the federal habeas courts reviewing his claim did not have to apply the "doubly deferential" review required when both <u>Strickland</u> and AEDPA are in play.  <u>See</u> *infra*. Nevertheless, the Supreme Court still concluded that the Sixth Circuit Court erred in granting Van Hook habeas relief.

prong and established that counsel's performance was deficient, Lesko failed to satisfy his

burden of showing that he was prejudiced:

> In our judgment, there is not a reasonable probability that a life sentence would have been returned if only the mitigation evidence presented at trial had been supplemented by the mitigation evidence presented at the PCRA hearing, particularly given the strength of the aggravating circumstances detailed above. Accordingly, we conclude that the PCRA court erred in granting a new penalty hearing.

Id.[20]

### Discussion

As explained above, because the Pennsylvania Supreme Court denied Claim V on the

merits, it is not for this Court to decide whether its decision was right or wrong.  See, e.g.,

Woodall, 134 S. Ct. at 1702 ("even 'clear error' will not suffice.") (quoting Lockyer, 538 U.S. at

75-76).  Rather, this Court has the authority to issue the writ of habeas corpus on this claim only

if Lesko demonstrates that the Pennsylvania Supreme Court's decision "resulted in a decision that

was contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States[.]"  28 U.S.C. § 2254(d)(1).[21]

---

[20]    In his concurring opinion, Justice Saylor stated that, although he agreed with the PCRA court that Marsh's performance was deficient, Lesko failed to meet his burden of showing that he was prejudiced.  Lesko XIII, 15 A.3d at 417-18 (Saylor, J., concurring).  Justice Todd dissented in part and concurred in part.  She explained that she agreed with the PCRA court that Claim V had merit and, therefore, Lesko was entitled to a new penalty hearing.  Id. at 418-26 (Todd, J. concurring and dissenting).

[21]    Because this claim is a mixed question of law and fact, Strickland, 466 U.S. at 698, this Court reviews it under § 2254(d)(1).  See, e.g. Jermyn v. Horn, 266 F.3d 257, 305-06 & n.24 (3d Cir. 2001).  Although Lesko repeatedly argues that the Pennsylvania Supreme Court's adjudication of a particular claim resulted in an "unreasonable determination of the facts" under § 2254(d)(2), almost all of his claims are mixed question of law and fact and the standard of review set forth in § 2254(d)(1) applies.  Nevertheless, this Court would reach the same outcome if it also applied § 2254(d)(2) to this and all of Lesko's other claims.  In no instance has Lesko met his burden of establishing that the state court's adjudication of any claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

The Pennsylvania Supreme Court applied the <u>Strickland</u> standard when it evaluated this, and all of Lesko's other, ineffective assistance of counsel claims. <u>Lesko XIII</u>, 15 A.3d at 373-74.[22] Accordingly, there can be no question that Claim V, and all of Lesko's other ineffective assistance of counsel sentencing-phase claims, withstand review under the "contrary to" clause of § 2254(d)(1). <u>Williams</u>, 529 U.S. at 406 ("a run-of-the mill state-court decision applying the correct legal rule from [Supreme Court] cases [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause.")

The only remaining inquiry for this Court is whether Lesko has demonstrated that the Pennsylvania Supreme Court's adjudication of Claim V was an "unreasonable application of" <u>Strickland</u>. As previously noted, the United States Supreme Court has stressed repeatedly the "highly deferential" review that this Court must accord the state court's decision in conducting the "unreasonable application" analysis. It has explained:

> Recognizing the duty and ability of our state-court colleagues to adjudicate claims of constitutional wrong, AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. AEDPA requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error ... beyond any possibility for fairminded disagreement." <u>Harrington v. Richter</u>, 562 U.S. —, — 131 S. Ct. 770, 786-787 (2011). "If this standard is difficult to meet" – and it is – "that is because it was meant to be." <u>Id.</u>, at —, 131 S. Ct., at 786. We will not lightly conclude that a State's criminal justice system has experienced the "extreme malfunctio[n]" for which federal habeas relief is the remedy <u>Id.</u>, at —, 131 S. Ct., at 786 (internal quotation marks omitted).

<u>Titlow</u>, 134 S. Ct. at 15-16 (parallel citations omitted).

---

[22]    Although Pennsylvania courts typically articulate <u>Strickland</u>'s test as a three-prong test for gauging ineffective assistance claims and <u>Strickland</u> sets forth its test in two prongs, the legal evaluation is the same, and the differences merely reflect a stylistic choice on the part of state courts.

In evaluating Claim V (and all Lesko's other ineffective assistance sentencing-phase claims), this Court also is mindful that:

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," [Strickland, 466 U.S.] at 689; Lindh v. Murphy, 521 U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly" so, Knowles, [556 U.S. at 123]. The Strickland standard is a general one, so the range of reasonable applications is substantial. [Id.] Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Richter, 131 S. Ct. at 788 (parallel citations omitted).

Lesko devotes approximately 84 pages in his brief to this claim. At the very most, however, Lesko only shows that the Pennsylvania Supreme Court arguably reached an incorrect result (although this Court does not think so, particularly with respect to its holding that Lesko was not prejudiced by counsel's alleged deficient performance). But such a showing, as the Supreme Court has repeated time and time again, does not suffice to entitle a federal habeas petitioner to relief under AEDPA.

The question before this Court is not whether defense counsel's performance was objectively unreasonable or whether Lesko was prejudiced. Instead, it is whether Lesko has met his burden of showing that the Pennsylvania Supreme Court's decision was an "unreasonable application of" Strickland. Simply put, Lesko has not met his burden. There is no basis to disturb the Pennsylvania Supreme Court's determination that defense counsel was not deficient under AEDPA's and Strickland's "doubly deferential," Knowles, 556 U.S. at 123, standard of review. But, importantly, even if Lesko proved that the state court's adjudication of Strickland's

first prong was "objectively unreasonable" – and he has not – he still must demonstrate that its determination that he was not prejudiced was "objectively unreasonable" too. That he cannot do. Lesko brutally murdered Levato and Newcomer just days before he participated in the murder of Officer Miller, who, as the Pennsylvania Supreme Court stated, "did nothing more than pull over the car in which Lesko was driving" after he and Travaglia purposely instigated him into chasing them. Lesko XIII, 15 A.3d at 345. Considering the powerful aggravating circumstances presented by the prosecution, the mitigating evidence that his defense counsel did present, and the mitigating circumstances that the jury did find, the Pennsylvania Supreme Court's decision that Lesko failed to establish prejudice was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S. Ct. at 786-87. Accordingly, Claim V is denied.

Although the PCRA court granted relief on the allegations Lesko makes in Claim V, it was considering a different issue than the one before this Court, which is reviewing the Pennsylvania Supreme Court's adjudication of Claim V through AEDPA's deferential lens. In light of the mitigation case that Marsh did present at the 1995 resentencing hearing and the very powerful and weighty aggravating circumstances that the prosecution proved, this Court does not believe that reasonable jurists would find this Court's assessment that the Pennsylvania Supreme Court's decision on Claim V withstands review under AEDPA to be debatable or wrong. Therefore, a certificate of appealability is denied.

### Claim I (Sentencing-Phase)

Lesko contends that he is entitled to another sentencing hearing because the suppressed evidence discussed previously impacted defense counsel's ability to adequately cross-examine

Rutherford and Montgomery at that 1995 resentencing hearing in order to "diminish" his involvement in the killing of Officer Miller. He also alleges that his defense counsel was ineffective for failing to adequately investigate and utilize the information they did possess or should have possessed in order to impeach Rutherford's and Montgomery's resentencing testimony.

In rejecting this portion of Claim I, the Pennsylvania Supreme Court explained that Rutherford's and Montgomery's testimony at the resentencing hearing "was offered merely as background to establish the circumstances of the crime giving rise to the jury's penalty phase duty[,]" and "was not used to prove the existence of any aggravating circumstance, but was merely used to put the case in context for the jury." Lesko XIII, 15 A.3d at 373. It then concluded:

> [A]t the resentencing, trial counsel elicited testimony from Montgomery that he had committed robberies with Travaglia prior to the murder of Officer Miller, N.T., 2/14/95, at 487; and trial counsel similarly elicited testimony from Rutherford that he had a deal with the Commonwealth that he would be tried as a juvenile for the Nicholls murder and that the charges against him were ultimately dismissed, N.T., 2/13/95, at 454. Indeed, trial counsel requested and the jury was given a corrupt source instruction regarding Rutherford's testimony. N.T., 2/17/95, at 19. For these reasons, we conclude that the PCRA court erred in holding that the result of the resentencing proceeding would have been different if counsel had impeached Montgomery and Rutherford with the Brady information.

Id.

Lesko has not demonstrated that the Pennsylvania Supreme Court's decision was "contrary to" or and "unreasonable application of" either Brady or Strickland. Therefore, the sentencing-phase portion of Claim I is denied. Lesko argues that the Pennsylvania Supreme Court did not address his ineffective assistance of counsel contentions and, therefore, this Court must review them *de novo*. The Pennsylvania Supreme Court was under no obligation to address

every argument made by Lesko, and if in fact its decision can be read as being silent regarding Lesko's ineffective assistance of counsel allegations, this Court must assume that it denied them on the merits. See Richter, 131 S. Ct. at 784 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated.") See, e.g., Rompilla v. Horn, 355 F.3d 233, 247-48 (3d Cir. 2004), rev'd on other grounds sub nom. Rompilla v. Beard, 545 U.S. 374 (2005) ("For purposes of [§ 2254(d)], a failure to decide affects the standard of review; a failure to discuss (either at all or to the satisfaction of the habeas petitioner or the federal court) is irrelevant.") (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000) and Chadwick v. Janecka, 312 F.3d 597, 605-07 (3d Cir. 2002)). Moreover, there is no indication that the Pennsylvania Supreme Court misunderstood the nature of this claim and thus failed to adjudicate any part of it on the merits. Nevertheless, even if this Court applied a *de novo* review to Lesko's ineffective assistance allegations, this Court would still deny relief because he failed to show that he was prejudiced by Marsh's alleged deficient performance.

Based upon all of the foregoing, the sentencing-phase portion of Claim I is denied. A certificate of appealability also is denied.

## Claim VI

Lesko contends in Claim VI that his defense counsel was ineffective for failing to effectively cross-examine Detective Amity on what Lesko refers to as "his absurd testimony at the resentencing hearing that [Lesko] had drawn a gun on him when the detectives charged the

hotel room with their guns drawn to arrest Lesko and Travaglia." According to Lesko, Amity's story was "simply incredible. Had [Lesko] done what the detective said, the officers would have shot him." [ECF No. 30, Brief at 159].

Lesko asserts that his defense counsel could have cross-examined the detective on two bases: (1) they could have shown that Detective Amity's testimony was inconsistent with what the detective had said in his own statements; and, (2) they could have brought out discrepancies with another police report that had described the incident differently. Lesko argues that while one statement indicated that Lesko raised a gun under the sheets while he was in bed (Vol. III, Sent. Tr. at 35), another indicated that he had stood up and had taken the gun out of his belt. (Def. PCRA Ex. S). In addition, Lesko argues, defense counsel could have shown that Detective Amity had an ulterior motive for this testimony. He points out that the January 3, 1980 police bulletin seeking the arrests of "prime suspects in the homicide of an Apollo, Pa. police officer," (Def. PCRA Ex. Z), did not list Lesko as a suspect. Accordingly, Lesko's argument goes, defense counsel could have cross-examined Detective Amity as to whether the detective made up or embellished the story about Lesko having drawn the gun to manufacture probable cause to arrest him.

In denying Claim VI, the Pennsylvania Supreme Court held:

Lesko's unsubstantiated belief that criminals never pull guns on police without getting shot is rank speculation, contradicted by common sense and experience. Lesko's alternative argument, concerning the detective's prior statements, ignores the fact that the extant police reports corroborated Detective Amity's central testimony that Lesko possessed a gun at the time of his arrest. Of course, Lesko himself was free to testify and directly contradict the detective, and have the jury decide who was telling the truth. But, the fact that Lesko would dispute the account does not mean that the detective's account was rendered inherently implausible. Additional cross-examination by counsel would have accomplished little, since the reports all supported the core of Detective Amity's testimony. Counsel is not obliged to pursue unpromising avenues of impeachment.

72

Lesko XIII, 15 A.3d at 394.

Lesko can make no credible argument that the Pennsylvania Supreme Court's decision was an "objectively unreasonable" application of Strickland. Therefore, Lesko focuses on his contention that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). It was not. Lesko primarily bases his argument upon a declaration from a former chief of police in Portland, Maine, William McClaran, Ph.D. Therein, McClaran opined that had Detective Amity's version of events been true, the officers would have shot Lesko.

Lesko's reliance on McClaran's declaration is misplaced because the PCRA court denied Lesko's request to present McClaran's testimony, concluding that the "theory of how a police officer is likely to respond or exercise his discretion in any given situation does not present a scientific principle which can discount Amity's recitation of the events which occurred on the night of [Lesko's] arrest." Lesko XI, No. 681 C 1980, slip op. at 18. Therefore, McClaran's declaration is not part of the record that this Court may consider in evaluating Claim VI. Cullen, 131 S. Ct. at 1401-03.

The Pennsylvania Supreme Court's adjudication of Claim VI easily withstands review under AEDPA and is denied. A certificate of appealability also is denied.

**Claim VII**

Prior to 1988, in its automatic review of a death sentence, the Pennsylvania Supreme Court had two options: "the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence."

42 Pa. Cons. Stat. § 9711(h)(2), *repealed* effective December 21, 1988.  In 1988, the statute was amended to read as follows:

> ... the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for further proceedings....  If the Supreme Court determines that the death penalty must be vacated because none of the aggravating circumstances are supported by sufficient evidence or because the sentence of death is disproportionate to the penalty imposed in similar cases, then it shall remand for the imposition of a life imprisonment sentence.  If the Supreme Court determines that the death penalty must be vacated for any other reason, it shall remand for a new sentencing hearing[.]

42 Pa. Cons. Stat. § 9711(h)(2) and (4), as amended 1988, Dec. 21, P.L. 1862, No. 179, § 2, imd. effective.  Section 3 of the act amending the statute provided that the amendment "shall apply to all criminal offenses committed on or after the effective date of this act and to all criminal cases or appeals pending on the effective date of this act."  Act of 1988, Dec. 21, P.L. 1862, No. 179, § 3.

In Claim VII, Lesko argues that because he was tried, convicted and his state appeals had been completed during the time that the pre-1988 version of § 9711(h) was in effect, that version should have applied to him after the Third Circuit granted him habeas relief in 1992.  Accordingly, he contends, the holding of his 1995 resentencing hearing violated his constitutional rights to due process and against ex post facto law.  Marsh raised this claim on direct appeal, and the Pennsylvania Supreme Court denied it.  It held that because Lesko was challenging his conviction and sentence in his first federal habeas case on the effective date of the act amending § 9711(h), Lesko's case fell within the language of Section 3 of the act amending the statute.  Lesko X, 719 A.2d at 220 ("[T]he legislature expressly designated that the amendment should be applied to '*all* criminal cases and appeals *pending* on the effective date of

74

this act.'  Act of 1988, Dec. 21, P.L. 1862, No. 179, § 3 (emphasis added).  This plainly sets no limits as to the courts in which cases and appeals were pending.").

In the PCRA proceeding, Lesko asserted that Marsh was ineffective in litigating the claim on direct appeal because he should have argued that the pre-amendment version of § 9711(h) conferred to him a "life and liberty interest" in a life sentence when his first death sentence was vacated, and that this life and liberty interest was infringed by the Commonwealth's resentencing of him.  The Pennsylvania Supreme Court denied this claim too.  It repeated the holding it made on direct appeal and held that Lesko's new "life and liberty" theory of relief had no merit whatsoever and, therefore, Marsh was not ineffective for failing to raise that argument on direct appeal.  <u>Lesko XIII</u>, 15 A.3d at 375-76.

Lesko has not met his burden of showing that the Pennsylvania Supreme Court's decisions can be disturbed by this Court under AEDPA.  His contention that it failed to review his federal constitutional claims on the merits in <u>Lesko X</u> is rejected.  Much of Claim VII is premised upon Lesko's contention the Pennsylvania Supreme Court erred when it concluded that amended § 9711(h) applied to his resentencing because the circumstances of his case fell within Section 3 of the act amending the statute.  The Pennsylvania Supreme Court's decision on that point was one purely of state law and, therefore, this Court cannot re-examine it.  <u>See</u>, <u>e.g.</u>, <u>Estelle</u>, 502 U.S. at 67-68.  There simply is no basis for this Court to conclude that the Pennsylvania Supreme Court's adjudication of this claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1) (emphasis added).  Claim VII is denied and a certificate of appealability also is denied.

## Claim VIII

Lesko has withdrawn Claim VIII.

## Claim IX

Lesko argues that his death sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment because of the length of time that he has been on death row. The only time that Lesko raised a version of this claim before the state court was in his direct appeal following his 1995 resentencing. The Pennsylvania Supreme Court denied it on the merits, holding:

> We are not persuaded that, by being housed with people like himself who have committed crimes so reprehensible to society as to warrant imposition of the death penalty, appellant has been subjected to an unconstitutional punishment. It has been repeatedly held that the death penalty does not constitute cruel and unusual punishment. E.g., Commonwealth v. Hardcastle, 519 Pa. 236, 546 A.2d 1101, 1111 (Pa.1988), cert. denied, 493 U.S. 1093, 110 S. Ct. 1169, 107 L.Ed.2d 1072 (1990). This conclusion is not altered by the fact that, prior to being executed, one ordinarily spends substantial time in incarceration while appeals challenging one's sentence are adjudicated.

Lesko X, 719 A.2d at 223.

Lesko suggests that at the time he litigated this claim on direct appeal, it was not fully ripe because at that point he had spent only approximately 15 years on death row. He provides no good explanation, however, as to why he did not then raise the issue again in his PCRA proceeding, even though by that time he had spent significantly more years on death row. At the time Pennsylvania Supreme Court issued its decision in his PCRA appeal, he had been serving his sentence for more than 30 years.

There is no basis for this Court to grant Lesko relief on Claim IX. The Pennsylvania Supreme Court adjudicated this claim on the merits the only time that he raised it – on the direct

review of his resentencing.  Thus, the only question this Court must ask in analyzing Claim IX is whether the Pennsylvania Supreme Court's 1998 decision denying it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" by that point in time.  28 U.S.C. § 2254(d)(1).  See, e.g., Greene v. Fisher, — U.S. —, 132 S. Ct. 38, 44 (2011) ("§ 2254(d)(1) requires federal courts to focus on what a state court knew and did, and to measure state-court decisions against this Court's precedents as of the time the state court renders its decision.") (internal quotations and citations omitted).  Lesko has not met his burden of showing that it was.  At the time the Pennsylvania Supreme Court issued its 1998 decision in Lesko X, there was no "clearly established Federal law, as determined by the Supreme Court of the United States" on the Eighth Amendment issue raised in Claim IX (nor, for that matter, is there any at this time).  Therefore, Claim IX is denied.  A certificate of appealability is denied as well.

## Claim X

Lesko alleges in Claim X that the trial court violated his constitutional rights when it allegedly improperly: (1) granted the prosecution's challenge for cause of Prospective Juror No. 103, Arelene Selepec, who asked whether a life sentence in Pennsylvania means a sentence of life without parole; and, (2) empaneled Audrey Pealstrom, Prospective Juror No. 181, who inquired about the capital appeals process.

### Background

As will be discussed in greater detail in this Court's discussion of Claim XVII, at the time of Lesko's 1995 resentencing hearing, the law regarding whether a capital sentencing jury in Pennsylvania must be instructed that a term of life imprisonment for first degree murder is a term

in which the defendant is ineligible for parole had recently changed due to a decision the Supreme Court issued approximately eight months beforehand, <u>Simmons v. South Carolina</u>, 512 U.S. 154 (1994). The facts relevant to Selepec are as follows. At the conclusion of her voir dire, the follow occurred:

> Q. [the prosecutor] Is there anything else that I haven't asked you or we haven't asked that would affect your ability to sit as a fair and impartial juror in this case?
>
> A. I have a question insofar as the law is concerned. In the state of Pennsylvania if a person is granted or is sentenced to life in prison, is that with the proviso there is no parole possible?
>
> (Mr. Marsh shaking his head in the affirmative.)
>
> MR. PECK [the prosecutor]: Did Mr. Marsh answer the question?
>
> THE COURT: Yes.
>
> MR. PECK: I disagree with that answer. It's not as simple as giving a yes or no.
>
> MR. MARSH: The Judge will charge the jury that life imprisonment in Pennsylvania is without parole.
>
> MR. PECK: I don't think that is a complete explanation.
>
> THE COURT: Life imprisonment in Pennsylvania is imprisonment that has no requirement of parole. That is correct. I don't think I can say any more than that right now. I cannot and that is correct. Without going into a lot of discussion and a lot of detailed description of all the consequences and circumstances and probably an argument on the law, I can't answer more than that today.

(Feb. 3, 6 & 7 Jury Selection Tr. at 161-62).

Selepec also stated that it "would be very difficult" for her to find in favor of the death penalty if the law required. (<u>Id.</u> at 163). After additional discussion, however, she said that "if the law required it" she could impose the death penalty "with great personal difficulty." (<u>Id.</u> at 164-65).

After Selepec was excused, the trial court told Marsh that "[i]f there are future questions about matters of law, let me try to answer them the best I can. And I am not certain that your answer was correct[.] . . . There is a great deal of question surrounding that issue and I think it is going to take some time to resolve it. We can't be telling the jurors today that is what the situation is." (Id. at 169-70). The prosecutor stated: "I bit my tongue. It was not proper for him to take your role. That may have tainted her in terms of me picking her as a juror. I move she be challenged for cause." (Id. at 170). The court then recalled Selepec and asked her to return on Monday. (Id. at 171).

That Monday, the court and counsel had a discussion about the change in the law wrought by Simmons, and what effect it would have on Lesko's resentencing hearing. (Id. at 246). The prosecutor pointed out that it was not certain that under Simmons Lesko's jury would receive an instruction regarding a life sentence and parole. (Id. at 247-48). The court discussed the prior requirements of Pennsylvania law, the changes that Simmons imposed, and decided that prior to observing what occurred at Lesko's trial, it could not say one way or the other what instruction would be given regarding the unavailability of parole for a life sentence. (Id. at 248-49). Therefore, the court concluded:

> [A]t this point in time I think it would be inappropriate to allow a juror to remain as a prospective juror and perhaps be chosen as a juror when they have received information that other jurors may or may not receive during the sentencing hearing…. I feel confident that we can obtain a fair, impartial and unprejudiced jury by continuing with this jury selection process without necessarily placing a person on the jury that has information that other jurors may or may not have. I think it would be improper at this time to do that…. Therefore, I am going to grant the Commonwealth's challenge for cause. Juror 103 is excused.

(Id. at 250-51).

The facts relevant to Pealstrom are as follows.  During her individual voir dire, Pealstrom inquired into Lesko's right to appeal the jury's verdict.

Q. [prosecutor]  Is there anything that we haven't asked you about, that we haven't discussed this morning that would in your mind prevent you from being a fair and impartial juror in this case?

A.  I have one question.  After this decision is determined by the jury is there any more levels of appeal or would this be the final –

THE COURT:  Well, it really has no bearing on what your decision should be in this case.

JUROR NUMBER 181:  No, I realize that.

THE COURT:  But under the law, the defendant is entitled to file an appeal.

JUROR NUMBER 181:  Okay.  Is the appeal automatic?

THE COURT:  It depends.

MR. MARSH:  Was there some reason for that question?

JUROR NUMBER 181:  I don't understand the court system of appeals.

MR. MARSH:  Is it just really a matter of curiosity for you?

JUROR NUMBER 181:  Yeah.

THE COURT:  Would it have any bearing on your decision one way or the other whether or not there was a right to appeal?

JUROR NUMBER 181:  No.

(Feb. 8, 1995 Excerpt of Jury Selection Tr. at 10-11).  Defense counsel challenged for cause based on a couple of reasons, including because Pealstrom made an "inquiry about the appeal process.  I think that indicates a sense of finality she wants to impose on the defendant."  (Id. at 14).  The court denied counsel's challenge, noting "I think it can also mean in my opinion that she feels some comfort in the fact that the decision would be reviewed."  (Id.)

**Discussion**

Lesko argues that there was no legal basis for the court's decisions to exclude Selepec but empanel Pealstrom. He contends that where the court is considering challenges for cause based on what he alleges (unpersuasively) is the same principle – knowledge of collateral information about the law – the essential fairness required by the Due Process Clause of the Fourteenth Amendment requires that the challenges be consistently resolved. Lesko argues that he was prejudiced because he was denied having a fair juror, Selepec, on his jury and, after his peremptory challenges were exhausted, he received an allegedly unfair juror, Pealstrom, who should have been dismissed for cause.

In his direct appeal, Lesko challenged the trial court's decision regarding Selepec. The Pennsylvania Supreme Court denied his claim, holding:

> The court noted that the question of whether, and under what circumstances, jurors should be instructed that a life sentence means life without parole had not yet been resolved by Pennsylvania courts. A trial court's decision to discharge a juror will not be reversed absent a palpable abuse of discretion. Commonwealth v. Jacobs, 536 Pa. 402, 639 A.2d 786, 790 (Pa.1994). No such abuse is evident here, inasmuch as the court's action was a mere precaution designed to assure that the jury would not be tainted by the information that defense counsel conveyed.

Lesko X, 719 A.2d at 221.

In his PCRA appeal, Lesko challenged what he contended was the "inconsistent and irreconcilable treatment" of Selepec and Pealstrom and in support cited Ham v. South Carolina, 409 U.S. 524, 526-27 (1973). In rejecting this challenge, the Pennsylvania Supreme Court agreed with the PCRA court that equating the circumstances of Selepec's voir dire with Pealstrom's was like comparing "apples to oranges." Lesko XIII, 15 A.3d at 416. Selepec was dismissed because Marsh told her that the court was going to instruct the jury that life

81

imprisonment meant life without parole. The problem was his answer to Selepec's question was that it was not at all clear at that point in time that the court would give that instruction (and, indeed, it did not), so Selepec was given potential misinformation. Pealstrom briefly was informed that an appeal would be available to Lesko, which was a correct and harmless statement of the law under the circumstances.

The Pennsylvania Supreme Court also held that Lesko's reliance upon <u>Ham</u> was misplaced:

> In <u>Ham</u>, *supra*, the U.S. Supreme Court concluded that the trial court committed reversible error when it did not permit the defendant to question prospective jurors as to racial bias under the particular circumstances of that case. <u>Ham</u> does not stand for the broad proposition for which Lesko cites it. Indeed, the U.S. Supreme Court has clarified that the decision in <u>Ham</u> was not of universal application. <u>See</u> <u>Ristaino v. Ross</u>, 424 U.S. 589, 96 S. Ct. 1017, 47 L.Ed.2d 258 (1976). Lesko does not cite the <u>Ristaino</u> case.

<u>Lesko XIII</u>, 15 A.3d at 416.

Lesko argues that the Pennsylvania Supreme Court's decision was an "unreasonable application" of <u>Ham</u>, but he has not come close to establishing that its decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 131 S. Ct. at 786-87. Lesko also argues that the Pennsylvania Supreme Court's decision was an unreasonable application of <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985). In <u>Caldwell</u> the Supreme Court overturned a death sentence after the prosecutor led the jury to believe that the final decision whether to condemn the defendant rested with the state appellate court. 472 U.S. at 323. <u>Caldwell</u> did not concern statements made to a juror during the voir dire process. To the extent that Lesko cited it to the Pennsylvania Supreme Court in support of his contention that his constitutional rights were

violated with respect to Pealstrom because she asked about the appellate process during her voir dire, the Pennsylvania Supreme Court's decision that it did not support Lesko's request for relief was not "contrary to, or an unreasonable application" of <u>Caldwell</u>.

Based upon all of the foregoing, Claim X is denied.  A certificate of appealability also is denied.

**Claim XI**

Lesko claims that his defense counsel was ineffective for failing to object to the "more terrible"/"less terrible" instructions given by the trial court, which he argues were incorrect and substantially impaired the ability of the jurors to follow the law.  In support of Claim XI, Lesko first points to the trial court's instructions during voir dire, in which it instructed most of the jurors that "aggravating circumstances are things about the case that make the killing and the defendant more terrible and thus deserving the of the death penalty."  According to Lesko, every juror who was empaneled also was instructed that "mitigating circumstances are those things about the case and about the killing and about the defendant which make it less terrible and therefore less deserving of the death penalty."  [ECF No. 30, Brief at 186].  Lesko also asserts that the trial court failed to inform the first two empaneled jurors that mitigating circumstances could encompass any aspect of Lesko's background or character, even those not directly connected to the circumstances of the crime.  Lesko next directs this Court to the trial court's closing instructions, in which it again utilized the "more terrible"/"less terrible" language:

> Your sentence will depend upon what you find about aggravating and mitigating circumstances.  They are things that make a first degree murder case either more terrible or less terrible.  Your verdict must be a sentence of death if you unanimously find, that is, all of you find at least on aggravating and no mitigating circumstance or circumstances or if you unanimously find one or more

aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases….

(Vol. VIII, Sent. Tr. at 23).

Lesko argues that the trial court's "more terrible"/"less terrible" instructions misstated the nature and use of mitigating evidence and improperly focused the jury's deliberations on how "terrible" the jury found his case to be, thereby diverting it from considering his moral culpability and giving full effect to his mitigating evidence. He also claims that his counsel was ineffective for not objecting because the instructions violated his Eighth Amendment rights, and for not litigating the alleged error on direct appeal.

The Pennsylvania Supreme Court denied Claim XI in <u>Lesko XIII</u>, 15 A.3d at 407-08, 412-13. It determined that Lesko failed to establish that defense counsel was ineffective in any way. <u>Id.</u> at 407-08. It also observed:

> The court's engagement with the jury in voir dire is not of the same magnitude as its role and interaction in describing to the selected jurors their actual obligations at the point where they retire to deliberate on the penalty verdict. Furthermore, any arguable omission regarding the broad character of mitigating circumstances during voir dire was later corrected by the trial court's proper instructions that told the jury that that it could consider 'any other mitigating matters concerning the character and record of the defendant or the circumstance or circumstances of his offense, including but not limited to, that the defendant is repentant....' N.T., 2/17/1995, 26-27. Accordingly, this claim of ineffectiveness is meritless.

<u>Id.</u> at 413

The Pennsylvania Supreme Court's adjudication easily survives federal habeas review under AEDPA. When language in jury instructions is challenged, the language in question "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." <u>Estelle</u>, 502 U.S. at 72 (quoting <u>Cupp v. Naughten</u>,

84

414 U.S. 141, 147 (1973)). The court must then consider "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." Id. (quoting Boyde v. California, 494 U.S. 370, 380 (1990)); see also Victor v. Nebraska, 511 U.S. 1, 6 (1994); Smith v. Horn, 120 F.3d 400, 411 (3d Cir. 1997). Considered in the context of the instructions as a whole, Lesko has not shown that there is a reasonable likelihood that the jury applied the challenged instructions in a way that violates the Constitution. There was no error in the language he cites. It did not divert the jury from focusing on his personal culpability to whether his case was "terrible." The court merely was explaining generally the role of mitigating and aggravating factors in a capital case as it introduced those concepts to the jury.

Additionally, as the Pennsylvania Supreme Court explained, when it instructed on mitigating circumstances, the trial court told the jury it was to consider, *inter alia*, "any other mitigating matters concerning the character and record of the defendant or the circumstance or circumstances of his offense, including but not limited to, that the defendant is repentant, the defendant's service to others on death row, the defendant's childhood and that the defendant's character has changed over the last 15 years of his confinement." (Vol. VIII, Sent. Tr. at 26-27). Thus, the trial court's instruction as a whole conveyed to the jury that it was to consider any aspect of the defendant's character, background or record that could justify imposing a life sentence.

Based upon all of the foregoing, Claim XI is denied and a certificate of appealability is denied.

**Claim XII**

**Background**

    To fully understand Claim XII, it his helpful to briefly discuss what occurred at Lesko's 1981 sentencing hearing and why the Third Circuit determined, in its 1991 decision in <u>Lesko VIII</u>, that errors that occurred during it entitled Lesko to sentencing-phase habeas relief.  Lesko testified at his 1981 sentencing hearing to support his mitigation case by discussing his deprived childhood and family background.  He did not testify as to the merits of the charges against him, and he was not cross-examined by the prosecution.  In his closing argument, the prosecutor made the following comments about Lesko's mitigating evidence concerning his background:

> Good character and record.  All of the character witness limited their testimony to a certain period of time …  We heard about John Lesko up to a certain point.
>
> And I want you to consider that.  John Lesko took the witness stand, and you've got to consider his arrogance.  He told you how rough it was, how he lived in hell, **and he didn't even have the common decency to say I'm sorry for what I did. I don't want you to put me to death, but I'm not even going to say that I'm sorry**.

<u>Lesko VIII</u>, 925 F.2d at 1540 (quoting 1981 Sent. Tr. at 1697) (emphasis added).

    The Third Circuit held that the prosecutor's criticism of Lesko's failure to express remorse penalized the assertion of his Fifth Amendment privilege against self-incrimination in violation of the rule in <u>Griffin v. California</u>, 380 U.S. 609 (1965).  <u>Id.</u> at 1541-45.  It explained that in the Third Circuit, the test for determining if a prosecutor's remark violates <u>Griffin</u> is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."  <u>Id.</u> at 1542 (citations omitted).  In its holding, the Third Circuit observed that Lesko "could not claim a fifth amendment privilege against cross-examination or prosecutorial comment on matters reasonably

86

related to his credibility or the subject matter of his testimony[,]" such as the biographical testimony he had presented. Id. (citing Harrison v. United States, 392 U.S. 219, 222 (1968) for the proposition that "[a] defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives[.]"). The prosecutor's comments at issue, however, were not of that type. The Third Circuit held that the "natural and necessary interpretation" of the prosecutor's comments would be that Lesko had a moral or legal obligation to address the charges against him – indeed, to apologize for his crimes – during his penalty phase testimony, and that the jury could and should punish him for his failure to do so." Id. at 1544. The court concluded that the prosecutor's statement violated the rule in Griffin, and that when that error was considered cumulatively with additional comments the prosecutor made in the closing arguments, which it also found to be improper, the error was not harmless.[23] Id. at 1545-47.

At his 1995 resentencing hearing, Lesko testified again. He stated that, around the time of the Levato, Newcomer and Officer Miller murders, he was taking drugs and abusing alcohol. He also testified that he was upset and traumatized by the sexual molestation that he and his brother experienced during their childhood years. In the following exchange during the prosecutor's cross-examination of him, Lesko contends in Claim XII that the prosecutor improperly commented on his decision to exercise his right to remain silent at his first sentencing proceeding. Lesko bases this claim on the highlighted text cited below. So that the exchange can be considered in context, the Court has provided more of the testimony then Lesko cites:

---

[23] As discussed *supra*, it is important to reiterate that the Third Circuit in Lesko VIII applied the harmless error test set forth in Chapman v. California, 386 U.S. 18, 24 (1967) instead of the one set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993).

Q. Let me take you to those statements that you gave Detective Amity back in January of 1980, Mr. Lesko, January 3rd and January 4th. Do you have a recollection of that time?

A. Yes, sir.

Q. Is it a clear recollection, sir?

A. Not clear, but I have a recollection of it, sir.

- - -

Q. Isn't it true at the end of each of those four statements, Mr. Lesko, that he asked you whether you wanted to change the statement or add something to it?

A. I believe he did, sir. Yes, sir.

Q. What was your response each time that question was asked to you at the end of each interview, Mr. Lesko?

A. I believe I said no, sir. I didn't say anything.

Q. Why didn't you tell him that you had been drinking, you had been on drugs during these episodes?

A. He didn't ask me, sir.

Q. You didn't think it was important 15 years ago to mention those items?

A. No, sir.

- - -

**Q. You were also called as a witness in your previous trial; isn't that correct?**

**A. During the sentencing phase, sir. Yes, sir.**

**Q. Did you think at that point it might be important to tell that jury that you were intoxicated and under the influence of drugs back between December 27th and January 3rd?**

(Vol. VII, Sent. Tr. at 67-69 (emphasis added)).

Defense counsel objected to the highlighted questioning on Fifth Amendment grounds and said that Lesko intentionally did not address the matter during his 1981 sentencing testimony

at the advice of counsel because at the time he had not yet been tried for the Levato and Newcomer murders, or been sentenced for the Nicholls murder. (Id. at 71). The court overruled the objection but told defense counsel that it would permit them to ask leading questions so that the defense would be "allow[ed] … to explain the motivation for his testimony at the [1981 sentencing] proceeding." (Id. at 72).

The line of questioning then continued:

**Q.      [D]o you remember during [your 1981 sentencing hearing] testimony before that jury, Mr. Lesko, you said nothing about being under the influence of alcohol at the time of the Miller killing? At the time Officer Miller was killed, you said nothing about being under the influence, isn't that true sir?**

**A.      That's possible, sir. I'll have to take your word. I do not know, sir.**

Q.      Which was consistent with your statements to Detective Amity? You told him nothing about being intoxicated or under the influence during any of the crimes that you admitted to committing before Detective Amity; isn't that true?

A.      I do not believe Detective Amity asked me if I was under the influence of alcohol or drugs at the time, sir.

Q.      He asked you if you wanted to add anything to the statement or change the statement, did he not?

A.      I assumed that was concerned with what I said, sir. I do not recall him asking me if I was under the influence of drugs. I believe he asked me what was my involvement, not what was I considering committing the crime, sir.

(Id. at 73-74 (emphasis added)).

Lesko argues that the prosecutor revisited the improper line of questioning in the closing to the jury. The highlighted portion is the part that Lesko cites, and the Court has provided more so that the challenged comment can be placed in context:

There is no evidence by any witness who saw Lesko during the course of this time that he was intoxicated or under the influence of alcohol. We asked Rutherford. He was running the streets. He knew about drugs and alcohol. How did they appear? They appeared normal. They laughed. They joked. It was like nothing. Not falling down drunk, doesn't see them consuming drugs. And isn't it interesting, ladies and gentlemen, in 1981 when John Lesko testified before another jury, he didn't tell them that he was under the influence of drugs and alcohol. **Don't you think that would be important when you committed these homicides**, Peter Levato, Marlene Sue Newcomer and Officer Miller, **to tell that jury that I was drunk, that I had drugs and didn't know what I was doing, don't you think that would be something you would remember?** He was sure enough. He sure enough remembered to tell it to Doctor Levit on February 6th of this year when he was interviewed [for the purposes of the defense case at the resentencing hearing]. **After 15 years, he's remembered that detail. He remembers all of his drug abuse and alcohol abuse** started early, continued, only got worse, **but in 1981, he didn't mention a word to the jury about that, a word. What other defense is there? He forgot this defense?**

(Id. at 172-73 (emphasis added)). Marsh objected at this point and moved for a mistrial, which the court denied. (Id. at 173, 176-77).

On direct appeal of the resentencing, Marsh argued that the prosecution's questioning during cross-examination and statements during closing argument improperly commented on Lesko's Fifth Amendment privilege to remain silent at his 1981 sentencing hearing. In adjudicating this claim, the Pennsylvania Supreme Court referenced the Third Circuit's decision in Lesko VIII and its citation to Harrison v. United States, 392 U.S. 219 (1968) in support of the proposition that Lesko "could not claim a fifth amendment privilege against cross-examination or prosecutorial comment on matters reasonably related to his credibility or the subject matter of his testimony." Lesko X, 719 A.2d at 222 (quoting Lesko VIII, 925 F.2d at 1542). It then denied the claim, stating: "Unlike the original sentencing proceeding where the Commonwealth was deemed to have improperly commented on appellant's failure to testify regarding the merits of the charges against him, see Lesko [VIII], 925 F.2d at 1544, **the Commonwealth's cross-**

**examination and closing argument at the resentencing hearing addressed only the credibility of the testimony that appellant provided.  The Commonwealth was perfectly within its bounds to challenge the credibility of biographical testimony that appellant provided."**  Id. (emphasis added).

In his PCRA proceeding, Lesko raised the claim again, but this time repackaged it within an ineffective assistance of direct appeal counsel claim.  According to Lesko, Marsh was ineffective in litigating the claim on direct appeal because he failed to explain the "substantial prejudice" that resulted from the prosecutor's comments (that is, that the prosecutor's alleged improper comment on Lesko's silence undermined the credibility of Lesko's and Dr. Levit's testimony).  The Pennsylvania Supreme Court was not persuaded by Lesko's argument, explaining:

> The current focus of Lesko's claim does not establish arguable merit for a claim of ineffectiveness deriving from an underlying claim previously rejected on the merits.  The fact remains that Lesko opened the door to the voluntary intoxication impeachment at resentencing, and there is nothing improper in a party attempting to undermine the credibility of testimony through impeachment by noting a failure to forward a claim or defense during prior testimony on the same subject.  Cf. Harrison v. U.S., 392 U.S. 219, 222, 88 S. Ct. 2008, 20 L.Ed.2d 1047 (1968) ("A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives....").  Furthermore, the fact that properly admitted evidence is "prejudicial" is no basis for its exclusion.  Accordingly, Lesko has not demonstrated that counsel was ineffective in failing to "fully" argue this issue on direct appeal.

Lesko XIII, 15 A.3d at 387-89.

### Discussion

Lesko has not met his burden of demonstrating that the Pennsylvania Supreme Court decisions in which it denied the allegations he makes in Claim XII can be disturbed under

AEDPA's deferential standard of review. He criticizes the Pennsylvania Supreme Court for citing to Harrison, but it did so because the Third Circuit cited to it in support of the same proposition in Lesko VIII. Lesko also suggests that the Pennsylvania Supreme Court's decisions were erroneous under the holding of Lesko VIII, but that argument gets him nowhere. The issue before the Third Circuit in Lesko VIII was, as the Pennsylvania Supreme Court recognized, much different than the issue that was before the state court following the 1995 resentencing. Even more importantly, in evaluating whether Lesko is entitled to relief under AEDPA, the consideration is not whether the Pennsylvania Supreme Court misapplied a rule set forth in a Third Circuit case. See, e.g., Woodall, 134 S. Ct. at 1702 n.2 (a federal habeas court may not consult circuit precedent, rather than those of the Supreme Court, in assessing a habeas claim governed by § 2254); Frost, 135 S. Ct. at 431; Lopez, 135 S. Ct. at 2 ("We have emphasized, time and again, that [AEDPA] prohibits the federal courts from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established.'") (citation omitted).

Lesko has not shown that the Pennsylvania Supreme Court's decision to deny his Fifth Amendment claim or his claim that Marsh was ineffective was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2). Therefore, Claim XII is denied. A certificate of appealability also is denied.

**Claim XIII**

In his next claim, Lesko argues that the prosecutor objectionably elicited evidence of, and then commented upon, his lack of remorse at the time of arrest in violation of his Fifth, Eighth and Fourteenth Amendment rights, and that his defense counsel was ineffective for failing to properly preserve an objection and pursue such claims on direct appeal. This argument involves prosecution witness Detective Amity. He testified at the resentencing hearing regarding the statement that Lesko gave police about the murder of Levato. After Detective Amity read Lesko's statement into the record, in which he told the officer the brutal details of Levato's murder, the prosecutor asked the detective what Lesko's "demeanor" was at the time of this interview. Detective Amity responded, "I couldn't see where he had any remorse over what he did." (Vol. III, Sent. Tr. at 62). Marsh objected, and the trial court sustained the objection and instructed the jury "to disregard the statement." (Id. at 62-63). The prosecutor then cautioned the detective not to offer a conclusion, and rephrased his question, not in terms of demeanor, but in terms of what Lesko expressed during the interview: "[w]as there any remorse expressed by him at this interview?" Detective Amity responded, "no." (Id. at 63). This time, defense counsel did not object. Thereafter, however, counsel requested a mistrial, asserting that the prosecutor "snuck in" the testimony of absence of remorse. (Id. at 65). The prosecutor responded he did not "prompt Detective Amity in any way in terms of telling him to say there was no remorse" and also stated that his comment was not prejudicial because the issue was made relevant by the defense contention that Lesko's remorse was a mitigating circumstance. The trial court denied the motion for a mistrial. (Id. at 66). According to Lesko, the prosecutor

referred to the exchange in his closing argument, asserting that Lesko's "attitude" had not changed while he was in prison.[24]

Lesko contends that Detective Amity's testimony introduced a non-statutory aggravating circumstance (absence of remorse) for the jury's consideration in violation of his Eighth and Fourteenth Amendment rights. Therefore, Lesko asserts, his defense counsel was ineffective for failing to object on these bases.

In denying Claim XIII, the Pennsylvania Supreme Court first held:

> In this case, Lesko produced affirmative evidence of his remorse as a mitigating circumstance, and counsel argued the point in both opening and closing to the jury. The Commonwealth obviously was entitled to challenge the sincerity of the late expression, no less than it was entitled to rebut his testimony of voluntary intoxication by noting the failure to forward that claim when he testified at the first sentencing proceeding. See Lesko [X], 719 A.2d at 222. Rebuttal of mitigation evidence does not introduce a non-statutory, additional aggravating circumstance; hence, Lesko's claim of counsel ineffectiveness fails.

Lesko XIII, 15 A.3d at 390.

Lesko makes no convincing argument challenging the Pennsylvania Supreme Court's conclusion that the testimony and argument at issue did not introduce a non-statutory aggravating circumstance. Thus, there is no basis for this Court to disturb its concomitant decision – that defense counsel was not ineffective for failing to litigate a meritless issue – under AEDPA's standard of review. Accordingly, this portion of Claim XIII is denied.

The Pennsylvania Supreme Court next addressed Lesko's argument that:

---

[24] The Court is not convinced by Lesko's argument that the prosecutor returned to the "no remorse" theme in his closing in a manner that implicated Lesko's Fifth Amendment right to remain silent. In this Court's opinion, the portions of the transcript that Lesko cites (Vol. VII, Sent. Tr. at 173-76) do not support his interpretation. Nevertheless, this Court's opinion on that point does not matter in the analysis of Claim XIII. Even if Lesko's interpretation of the prosecutor's closing remarks is accepted, he still is not entitled to relief on this claim.

the PCRA court erred in holding that he opened the door to rebuttal evidence on remorse because it was "simply impermissible" for the Commonwealth to rebut remorse mitigation evidence with evidence concerning his silence at the time of his arrest. In support of this argument, Lesko cites to <u>Cooper v. Oklahoma</u>, 517 U.S. 348, 354 (1996), for the boilerplate proposition that the right to remain silent 'without penalty for doing so' is a fundamental trial right.

<u>Id.</u> at 390 (citing Brief of Appellant at 38-39). The Pennsylvania Supreme Court assumed without deciding "that defense counsel could have forwarded a Fifth Amendment-based objection to the form of the Commonwealth's manner of rebutting Lesko's expression of remorse, and we will assume further that such an objection might have been sustained[.]" <u>Id.</u> at 393. It then held that Lesko's ineffectiveness claim nevertheless failed because he did not meet his burden of showing that he was prejudiced:

Lesko never intimated that he had felt remorse at the time of this murder or his other crimes. But, the prosecutor's rebuttal was backward-looking, as it was limited to Lesko's failure to express remorse at the time of his arrest. The Commonwealth's rebuttal did not address Lesko's overarching "I'm a changed man" theme. Notably, and presumably as a result of Lesko's remorse and reformation testimony and the corroborating testimony of Chaplain Abdul, at least one juror found as a mitigating circumstance Lesko's change in character over the last fifteen years of his confinement under the catchall mitigator, 42 Pa. C. S. § 9711(e)(8). Thus, it appears that Detective Amity's statement regarding Lesko's failure to express remorse at arrest was unsuccessful at blunting the point in mitigation that Lesko sought to make. On this record, and particularly in light of the strength of the aggravating circumstances (as we have addressed at length above), we conclude that Lesko has not proven <u>Strickland</u> prejudice.

<u>Id.</u> at 393-94.

Lesko takes issue with the Pennsylvania Supreme Court's characterization of the prosecutor's rebuttal as backward looking, but no argument that he makes supports the conclusion that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded

disagreement." <u>Richter</u>, 131 S. Ct. at 786-87. For that reason alone, this portion of Claim XIII fails. Lesko also argues that the state court's decision was "unreasonable" because the "Third Circuit found the prosecutor's similar comments on his lack of remorse to be prejudicial" in <u>Lesko VIII</u>. This argument has no merit for several reasons. First, as already explained, under AEDPA the issue before this habeas court is whether the state court applied decisions by the United States Supreme Court – not the federal courts of appeals – unreasonably. Reliance on the decision in <u>Lesko VIII</u> also is problematic, and indeed unpersuasive, for the additional reason that, when the Third Circuit issued that decision, AEDPA had not yet been enacted. Therefore, it reviewed the claims before it *de novo*, whereas in this case AEDPA's deferential standard of review applies to Lesko's sentencing-phase claims. Finally, as explained *supra*, the Third Circuit in <u>Lesko VIII</u> applied the <u>Chapman</u> test when it determined that the prosecutor's improper comments were not harmless, whereas the law is clear that now "the more forgiving" <u>Brecht</u> harmless error test applies under such circumstances.[25]

Based upon all of the forgoing, Claim XIII is denied. A certificate of appealability also is denied.

## Claim XIV

Lesko argues that the prosecutor impermissibly appealed to vengeance in his closing argument when he made the following comment:

---

[25]     Lesko also claims that Pennsylvania Supreme Court failed to consider the cumulative effect of the alleged improper comments that the prosecutor made. A cumulative analysis was not applicable because the only potentially improper remark that the state court determined the prosecutor may have made was the one discussed in Claim XIII, in which it assumed without deciding that defense counsel should have made a Fifth Amendment-based objection to the form of the prosecution's manner of rebutting Lesko's expression of remorse.

96

Remember all the pity and all the sympathy that John Lesko must have felt for Peter Levato that night. Remember all of the sympathy that he showed him, all the mercy that he showed him. When you think about Marlene Sue Newcomer, think about her handcuffed in the back seat of her car with a blanket over her, being shot at and then being killed and remember all of the mercy and all the sympathy that John Lesko showed her. On January 1, 1980, and the climax of these eight days, remember Officer Miller being goated [sic], literally goated [six] into chasing Travaglia and when he comes up to him, being killed and being urged by John Lesko to hit him again. Remember his prideful remarks that night, I wanted to kill him. Remember all of the mercy and all the sympathy that John Lesko showed Officer Leonard Miller on January 3, 1980.

(Vol. VII, Sent. Tr. at 174-75).

Lesko contends that the prosecutor's appeal for vengeance, and the trial court's decision to allow his comments to stand, deprived him of a fair sentencing proceeding, in violation of his due process rights and the prohibition against cruel and unusual punishments. He compares the above-cited comment to the ones "found to be reversible error [at his] first sentencing by playing to the jury's emotions and obtaining 'an unreasonable and retaliatory sentencing decision, rather than a decision based on reasoned moral response to the evidence.'" [ECF No. 30, Brief at 207-08 (quoting Lesko VIII, 925 F.2d at 1545)].

The Pennsylvania Supreme Court disagreed with Lesko's characterization and, in denying Claim XIV, held:

[A]ppellant claims that this was essentially identical to the appeal for vengeance that was made during his original sentencing hearing. We do not agree. At the original hearing, the prosecutor argued that the death penalty should be imposed to fulfill the jury's "duty" to even the "score," which stood at "John Lesko and Michael Travaglia two, Society nothing." Lesko [VIII], 925 F.2d at 1545-46. See generally Commonwealth v. Johnson, 542 Pa. 384, 668 A.2d 97, 107-08 (Pa. 1995) (prosecutorial remarks at penalty hearing must not "arouse the jury's emotions to such an extent that it is impossible for the jury to impose a sentence based on relevant evidence"), cert. denied, 519 U.S. 827, 117 S. Ct. 90 (1996). The comments at the resentencing proceeding were of a different sort. They focused on details of the crimes, and encouraged the jury to pay particular attention to the callous manner in which appellant acted. This did not invite a

97

retaliatory sentencing decision; rather, it invited a decision that took into account all of the relevant facts – including those which shed light on appellant's cold–hearted and unmerciful character. Consideration of evidence relating to character is properly at the core of the sentencing decision. Commonwealth v. Beasley, 505 Pa. 279, 479 A.2d 460, 465 (Pa. 1984). The remarks in question would not have impeded the jury in rendering a verdict based on the evidence.

Lesko X, 719 A.2d at 222-23.

The Pennsylvania Supreme Court's adjudication of Claim XIV withstands review under AEDPA. The United States Supreme Court has said that in evaluating the challenged comment by the prosecutor, "the relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the conviction [or, in this case, the sentence of death] a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). Lesko has not cited to any more specific rule from a Supreme Court decision to support his contention that the challenged comments the prosecutor made during his 1995 resentencing violated his due process rights, or any other constitutional right.

Once again, Lesko relies upon the Third Circuit's decision in Lesko VIII, but this Court already has explained why such reliance is problematic. This Court can grant Lesko habeas relief on Claim XIV only if the Pennsylvania Supreme Court's decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, **as determined by the Supreme Court of the United States,**" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (emphasis added). Lesko has not met his burden of showing it was any of those things.

Based upon all of the foregoing, Claim XIV is denied. A certificate of appealability also is denied.

## Claim XV

Lesko argues that his rights to due process and against cruel and unusual punishment were violated where the jury considered and weighed the same conduct as multiple aggravating factors. He contends that his two other murder convictions (for Levato and Newcomer) should have been considered under either the aggravating circumstance in § 9711(d)(10) ("The defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable") or the aggravating circumstance in § 9711(d)(9) ("The defendant has a significant history of felony convictions involving the use or threat of violence to the person"), but not both. Lesko further argues that the Levato and Newcomer convictions comprise one aggravating circumstance under § 9711(d)(10), not two.

In Lesko's direct appeal from his resentencing, Marsh raised the argument that the duplicative use of the aggravating evidence was improper under the state death penalty statute. The Pennsylvania Supreme Court rejected this claim, holding: "Nothing in the statute provides that a criminal conviction may be considered under only one subsection. Here, the murders of Levato and Newcomer fit under both (d)(9) and (d)(10), and were, therefore, properly considered by the jury as presenting aggravating circumstances under both (d)(9) and (d)(10)." Lesko X, 719 A.2d at 224.

In his PCRA proceeding, Lesko repackaged his challenge by arguing that the multiplicative use of aggravating evidence improperly skewed the weighing process in favor of

death in violation of his rights to due process and against cruel and unusual punishment, and that

Marsh was ineffective for failing to raise his direct-appeal challenge under the Eighth and

Fourteenth Amendments.  In support of this claim, Lesko relied upon the United States Court of

Appeals for the Tenth Circuit's decision in United States v. McCullah, 76 F.3d 1087 (10th Cir.

1996).

The Pennsylvania Supreme Court rejected Lesko's contention that Marsh was ineffective

because it found that Lesko's underlying claim that his constitutional rights had been violated

had no merit.  It held that the Tenth Circuit's decision in McCullah did not support his claim, that

Lesko had misrepresented the holding in that case, and that he failed to discuss relevant

subsequent Tenth Circuit case law on the issue.  Lesko XIII, 15 A.3d at 403.  Importantly, it also

observed that Lesko could cite to no United States Supreme Court decision to support his claim

for relief.  Id. at 403-04.

Under AEDPA's standard of review, Lesko cannot prevail on Claim XV.  The

Pennsylvania Supreme Court determined that Marsh was not ineffective because the underlying

claim of constitutional error that Lesko asserts he should have raised had no merit.  Since the

United States Supreme Court has never held that it is constitutional error to submit to the jury

separate, multiple aggravators based upon the same underlying factual predicate, the

Pennsylvania Supreme Court's decision cannot be "contrary to, or … an unreasonable application

clearly established Federal law, **as determined by the Supreme Court of the United States**."

28 U.S.C. § 2254(d)(1)(emphasis added).  See, e.g., Rountree, 640 F.3d at 537 ("Of course, a

state court's resolution of a question that the Supreme Court has not resolved can be neither

contrary to, nor an unreasonable application of, the [Supreme] Court's precedent.") (citing Kane,

546 U.S. 10-11).  Accordingly, Claim XV is denied.  A certificate of appealability also is denied.

**Claim XVI**

Lesko contends that three of the trial court's evidentiary rulings violated his federal constitutional rights. Like so many of Lesko claims, however, it is necessary to give more background than he provides to the Court, because he does not give a full and accurate account of what occurred.

In his first evidentiary challenge, Lesko takes issue with the trial court's decision to refuse to permit certain testimony from one of his experts, Lois Nardone. During her lengthy testimony about Lesko's life and family history, defense counsel sought to elicit testimony from her about Lesko's grandmother, Anna Ridge, and her husband, James Ridge. (Vol. V, Sent. Tr. at 578-79). Much of the testimony came in, but the prosecutor objected to a certain line of testimony "unless she can establish [Lesko] knew these particular facts she intends to testify about." (Id. at 580). The trial court agreed, advising defense counsel to "[l]ay a foundation first, otherwise it's not relevant." (Id.) Nardone continued to provide detail about Anna and James Ridge's marriage, including that James was "a violent drunk[,]" that Anna:

> … used to drink as well, and they would engage in a lot of fighting. There was constant verbal abuse, chaos in the home, name calling. Mr. Ridge was to have said to go outside of the home to seek love and affection because Anna was described as a cold and unloving woman. According to Bunny, Mr. Ridge had a number of affairs outside of the home, and that her parents, she said, never had sex together. They only had sex on payday when her mother would want the check from the father, and that is the only reason the mother would give in. They slept in separate bedrooms.

(Id. at 582-83). At this point, the prosecutor objected again, and the trial court ruled: "Anything you are going to testify to, Ms. Nardone, is not considered relevant unless you can establish Mr. Lesko is aware of it and was aware of it prior to the incident in question. Unless you have information that establishes that, otherwise the ground rules are, it is irrelevant." (Id. at 583).

101

"Are you able to do that?" the trial court asked Nardone. She replied: "I can tell you [Lesko] did say his grandparents were very cold, very hostile to one another, that there was a lot of fighting in the home, that there was constant chaos." (Id.) The prosecutor objected to her question as unresponsive and noted that the "[t]he question was if he had knowledge what she testified to was sexual relations between two individuals." (Id. at 583-84). The trial court agreed, and granted the prosecutor's motion to strike that portion of Nardone's testimony. (Id. at 584). She continued to testify about Lesko's life history and family background with no other relevant objections made by the prosecutor. (Id. at 584-603).

Lesko next challenges the trial court's decision to allegedly "unduly restrict" the testimony offered by Chaplain Hamid Abdul. Abdul testified extensively about many topics, including the difficult conditions at SCI Graterford, that he had not observed Lesko being physically violent, that Lesko read religious materials and that they discussed them together, and that Lesko "has been a model to show that you don't have to be a part of that insane makeup that most of [the death row inmates] have." (Id. at 644. See id. at 619-44). Abdul described how he prayed with Lesko, that he is a "beneficial person on death row," and gave several examples to support his opinion. (Id. at 644-50). Towards the end of Abdul's direct testimony, defense counsel asked him whether Lesko is "remorseful for what occurred." (Id. at 656). The prosecutor objected. The trial court asked defense counsel: "Are you asking this witness for his opinion or whether Lesko has expressed remorse?" Defense counsel replied, "I'm asking his opinion." The trial court sustained the objection but told defense counsel "[y]ou may rephrase the question." (Id.) Defense counsel did, and Abdul testified that "the appearance that [Lesko] demonstrates, it does show that … he is remorseful, that he is repentive." (Id. at 657).

Lesko raised his challenges to the evidentiary rulings regarding Nardone and Abdul in his direct appeal. In denying them, the Pennsylvania Supreme Court held:

> It is well established that a defendant is to be accorded wide latitude in demonstrating mitigating circumstances. See Commonwealth v. Travaglia, 467 A.2d at 300. The testimony that appellant sought to introduce was, however, properly excluded. It was, quite simply, not relevant to proof of mitigating circumstances.
>
> Specifically, the court did not permit a social worker, Lois Nardone, to testify regarding tangential aspects of appellant's family background that were not known to appellant before he committed the crime. Nardone provided extensive testimony about various aspects of appellant's family history. But when she attempted to testify regarding the marital relationship of appellant's grandmother, including extraneous details such as whether the grandmother slept alone or engaged in sex only on paydays, the testimony was excluded as irrelevant. Nardone was unable to provide any basis for belief that appellant would have been aware of such details. Matters of which appellant had no knowledge would certainly not have been mitigating factors in his criminal acts.
>
> The court also excluded small portions of the testimony of Hamid Abdul, an Islamic chaplain who served as a religious mentor and counselor to appellant in prison. Abdul testified regarding the prison environment where appellant was incarcerated, and about appellant's personality, interests, and behavior. Abdul was not, however, permitted to state his personal opinion as to whether appellant is remorseful, though he was allowed to say that appellant's appearance is demonstrative of remorse.

Lesko X, 719 A.2d at 223.

In support of Claim XVI, Lesko recounts the very general proposition that his "rights to due process, and against cruel and unusual punishment demand that a capital defendant be given broad latitude to present mitigating evidence relevant to his character, record, and background, and that a capital sentencing hearing jury be allowed to give full consideration and effect to such mitigating evidence." [ECF No. 30, Brief at 217]. In support, he cites to numerous Supreme Court cases, including Eddings v. Oklahoma, 455 U.S. 104, 110-12 (1982) and Lockett v. Ohio, 438 U.S. 546, 604-05 (1978). He then argues that the Pennsylvania Supreme Court's ruling was "an unreasonable application of the Supreme Court's Eighth Amendment jurisprudence under

Lockett, Eddings, and their progeny[,]" [ECF No. 30, Brief at 221], but he makes no convincing argument to show, as he must, that the state court's decision was an unreasonable application of any rule announced by any United States Supreme Court decision under the circumstances presented, particularly given that the trial court made very specific and limited evidentiary exclusions, but permitted a great deal of the testimony of Nardone and Abdul to be introduced to support his mitigation case. Lesko simply has not shown that the Pennsylvania Supreme Court's ruling on this portion of Claim XVI "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S. Ct. at 786-87.

In his final evidentiary challenge, Lesko argues that the trial court erroneously prohibited him from introducing evidence that Travaglia had received a death sentence for the very same crime. The prosecutor objected, and the trial court instructed both parties to conduct research on the issue and that they would reconvene at a set time to resolve the legal issue. (Vol. VI, Sent. Tr. at 768-74). The next day, the trial court sustained the prosecutor's objection. (Vol. VII, Sent. Tr. at 21).

Lesko challenged the trial court's ruling in his PCRA appeal. The Pennsylvania Supreme Court denied it, holding:

> While evidence that a capital defendant played a lesser role in the murder than a confederate may be relevant evidence in mitigation, the sentence received by a criminal confederate is not, especially given the individualized nature of sentencing. The sentences received by confederates are not probative of specific statutory mitigators, nor are they relevant evidence respecting the defendant's character or record or the circumstances of the offense itself, which states must permit. See Skipper v. South Carolina, 476 U.S. 1, 4, 106 S. Ct. 1669, 90 L.Ed.2d 1 (1986) (capital sentencer cannot be precluded from considering, as mitigating factor, aspects of defendant's character or record and circumstances of offense proffered as basis for sentence less than death); 42 Pa. C. S. § 9711(e) (outlining statutory mitigators, including character/record/circumstances catchall mitigator

at subsection (e)(8), which "obviously mirrors the requirements of <u>Skipper</u>." <u>Commonwealth v. Harris</u>, 572 Pa. 489, 817 A.2d 1033, 1054 (2002)). Lesko fails to acknowledge this governing authority much less does he attempt to distinguish it.

<u>Lesko XIII</u>, 15 A.3d at 398-400.

Lesko makes the rote argument that the Pennsylvania Supreme Court's decision was unreasonable, but he makes no convincing argument to support a finding that the state court's adjudication of this portion of Claim XVI is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 131 S. Ct. at 786-87. Therefore, this portion of Claim XVI must be denied as well. In addition, Lesko is not entitled to a certificate of appealability on Claim XVI.

## Claim XVII

At his resentencing, after much discussion on the topic, Lesko's defense counsel made the decision not to request that the court give a "<u>Simmons</u> instruction." Lesko argues that counsel was ineffective for making that decision. Although the record is clear that defense counsel did not want the trial court to give the instruction, Lesko contends that Marsh was ineffective for not arguing on direct appeal that the trial court violated his Eighth and Fourteenth Amendment rights by failing to give it.

### Background

As mentioned previously, approximately eight months before Lesko's resentencing hearing in 1995, the United States Supreme Court decided <u>Simmons v. South Carolina</u>, 512 U.S. 154 (1994). In Simmons's direct appeal, a plurality of the Supreme Court ruled that, under the circumstances presented in his case, due process required the trial judge to inform the jury that

he would not have been eligible for parole if sentenced to life imprisonment. The Supreme Court held that "where the defendant's future dangerousness **is at issue**, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." Id. at 156 (emphasis added). The plurality reasoned that "[t]he State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole." Id. at 171.

In her concurring opinion, Justice O'Connor phrased the dispositive question as whether "**the prosecution argues** that the defendant will pose a threat to society in the future." Id. at 177. (O'Connor, J., concurring) (emphasis added). The Third Circuit has held that Justice O'Connor's narrower view expressed in her concurring opinion in Simmons is the controlling opinion. Robinson, 762 F.3d at 325 (Justice O'Connor's "narrower view is controlling."); Bronshtein v. Horn, 404 F.3d 700, 716 (3d Cir. 2005) ("Justice O'Connor's controlling concurrence may be read as adopting a narrower holding, namely, that the dispositive question is not whether a defendant's future dangerous[ness] is 'at issue' but whether "**the prosecution argues** that the defendant will poses a threat to society in the future.") (emphasis in original); Rompilla, 355 F.3d at 265 (same).

That is where the law stood at the time of Lesko's 1995 resentencing hearing. Near the end of the sentencing proceeding, Marsh addressed the topic of Simmons when discussing proposed jury instructions. He informed the court that defense counsel was not requesting a parole ineligibility instruction at the time but might do so later depending on what "the prosecutor argues." (Vol. VII, Sent. Tr. at 144). Defense counsel subsequently decided not to

request that a <u>Simmons</u> instruction be given.  At the PCRA hearing, Marsh explained why they made the decision:

> [The prosecutor] indicated that if the Court gave an [instruction that life meant life without the possibility of parole], he would ask the Court to instruct the jury that the law permitted the governor to commute a life imprisonment sentence, which it does.  And the Court didn't – Judge Caruso didn't make a decision on what he would do, but he seemed to think that that could be appropriate, that if I asked the jury to be instructed that life means life, to balance the instruction, he would let the jury know that life doesn't necessarily mean life, because the governor can come in and commute the sentence.  I didn't want to take that risk, so I didn't ask for it.

(Dec. 1999 PCRA Hr'g Tr. at 37).  Later in his PCRA testimony, Marsh reiterated:  "I made a judgment call as to that instruction.  I felt it was better for our case at that time not to ask for the instruction, because of what it would stir up, as far as commutation, and I thought I could approach it a different way, than having the Court instruct it."  (<u>Id.</u> at 403).  Marsh explained that defense counsel decided to point out to the jury in the closing statement (which was made by Marsh's co-counsel, O'Leary) that, because Lesko already was serving three consecutive life sentences, he would never be released.  By proceeding this way, Marsh explained at the PCRA hearing, defense counsel could demonstrate to the jury that Lesko would spent the rest of his life in prison if the jury sentenced him to a life term, while at the same time avoid an instruction that the Governor could commute a life sentence.  (<u>Id.</u> at 403-04).

A review of O'Leary's closing argument shows that defense counsel followed their decided-upon approach.  He stated to the jury:

> And what you have to keep foremost in your mind today is that John Lesko, as he sits here, has three life sentences right now.  The prosecutor showed you these, had these read to you.  This is the Newcomer sentence.  On the charge of first degree murder, it is the sentence of the Court that you be confined in an institution to be determined by the Bureau of Corrections for the rest of your natural life.  This sentence is to be consecutive to the sentence imposed in Indiana

107

County, another life sentence.  Consecutive, that's a legal term for you'll never, ever, ever, ever get out of prison again in your life.

(Vol. VII, Sent. Tr. at 185).  The prosecutor objected and the court stated:  "So noted.  We'll deal with it after the argument."  (<u>Id.</u>)  O'Leary continued:

> And it is to run consecutive to the sentence imposed at Number 682 C 1980 in Westmoreland County and consecutive to any other sentence which you are now serving or which has been imposed.  It is the recommendation of this Court that you never be paroled.  What reasonable inference can you make from that sentence?  Is John Lesko ever going to be let out of prison?  Three life sentences.  They run consecutively.  A life sentence for the death of Susan Newcomer, a life sentence for the death of Peter Levato, a life sentence for the death of William Nicholls.

(<u>Id.</u>)  Later in his closing argument, when discussing that Lesko was a different person than the one who had committed those horrific crimes so many years ago, O'Leary stated:  "If something vital has returned, something precious has returned [it] is growing in the life of this man who will never see the light of day outside a prison again[.]"  (<u>Id.</u> at 196).

After O'Leary ended his closing argument, the court conducted a sidebar with counsel, in which the prosecutor complained that "after hours of conversation and debate about this in chambers[,]" O'Leary misrepresented the law in Pennsylvania by "representing to this jury that he would never get out of jail," when, in fact, commutation was a possibility.  (<u>Id.</u> at 199-200. <u>See</u> <u>also</u> <u>id.</u> at 204-07).  The court declined the prosecutor's request to instruct the jury to disregard O'Leary's remarks.  (<u>Id.</u> at 203-05).  The prosecutor stated that he "did not argue future dangerousness," and asserted that the court's ruling was unfair to the prosecution because it allowed O'Leary's statements to stand without the jury being instructed about the possibility of commutation.  (<u>Id.</u> at 205-07).

**Discussion**

The Pennsylvania Supreme Court held that defense counsel was not ineffective for failing to request a Simmons instruction and denied Claim XVII. Lesko XIII, 15 A.3d at 406. Lesko has not met his burden of showing that the state court's decision cannot withstand review under AEDPA. In fact, this Court would deny Claim XVII even under a *de novo* review. Because of the manner in which Lesko presented his claim to the state court (the Pennsylvania Supreme Court criticized him for "[i]gnoring that his claim is cognizable only as a claim of ineffective assistance[,]" id at 406 n.29), the court focused its analysis on whether he was entitled to a Simmons instruction and held that he was not. There is an even more obvious reason to deny Claim XVII, however. Regardless of whether Lesko would have been entitled to receive the Simmons instruction had it been requested, Lesko's defense counsel decided that they did not want the trial court to give it. They based their decision on the fact that, if the court gave it, it also would instruct the jury that the Governor had the authority to shorten a sentence of life without the possibility of parole through a commutation. Defense counsel's decision is precisely the type of strategic decision that the Supreme Court in Strickland held to be protected from second-guessing. 466 U.S. at 690-01.

Lesko argues that defense counsel's decision was not informed because Marsh testified at the PCRA hearing that he was unaware at the time of the resentencing that the Governor had commuted the first-degree murder sentence of only one individual since the death penalty was reinstated in Pennsylvania in 1978, and that if he had known that fact he would have raised it to counter the prosecutor's request to include the instruction on commutation. (Dec. 1999 PCRA Hr'g Tr. at 39-40). Lesko's argument is unconvincing. Defense counsel's strategic decision was sufficiently informed. Pennsylvania law permits the Governor to shorten a sentence through

commutation and defense counsel wanted the jury to avoid hearing that information. Even if defense counsel would have argued to the trial court that the data up to that point showed that the Governor had commuted only one first-degree murder sentence since 1978, there is no reason to believe that the court would have eliminated any mention of commutation if it gave the <u>Simmons</u> instruction.

Ultimately, defense counsel's strategy proved worthwhile. O'Leary was able to make the point during his closing argument that due to the consecutive life sentences that Lesko received for his role in the murders of Levato, Newcomer and Nicholls, Lesko would never be released from prison if the jury decided to sentence him to life imprisonment for murdering Officer Miller.[26] At the same time, defense counsel's strategy resulted in the court declining to instruct the jury about the Governor's commutation power. For these reasons, this Court concludes that Lesko has failed to show that his defense counsel's conduct was objectively unreasonable under <u>Strickland</u>. Likewise, he has failed to show that he was prejudiced by their decision.

Lesko's claim that Marsh was ineffective for failing to raise the <u>Simmons</u> issue on direct appeal also has no merit. Since defense counsel expressly told the trial court that Lesko was not requesting a <u>Simmons</u> instruction, any claim that Marsh raised on direct appeal that the trial court erred in not giving the instruction would have been denied.[27]

---

[26]     Lesko argues that the strength of O'Leary's argument was undercut by the instructions the court gave to the jury the next day, "to disregard any argument made by counsel regarding the status of the law." [ECF No. 30, Brief at 225 (citing Vol. VIII, Sent. Tr. at 15)]. That is not a fair summarization of the trial court's statement. What the court actually instructed was: "You are not to apply any law that counsel has referred to in their closing arguments that may be different or contrary to the law that I am telling you. If counsel has related to you law that is different or contrary to the law that I am giving you, you are to apply the law that I give you and to ignore any contrary version that you may have heard." (Vol. VIII, Sent. Hr'g Tr. at 15). Lesko has not shown that anything O'Leary said contradicted the court's instructions to the jury.

[27]     In 2002, the Supreme Court decided <u>Kelly v. South Carolina</u>, 534 U.S. 246 (2002). The Third Circuit has noted that <u>Kelly</u> "arguably broadened the holding in <u>Simmons</u>." <u>Robinson</u>, 762 F.3d at 326 (quoting <u>Rompilla</u>, *Continued on next page...*

Based upon all of the foregoing, Claim XVII is denied.  A certificate of appealability also is denied.

## Claim XVIII

Lesko argues that the trial court's jury instructions impermissibly singled him out as having an "interest" that might render his testimony suspect.  In support, he relies upon a portion of the trial court's instruction in which it informed the jury that although they "should not disbelieve the defendant's testimony merely because he is the defendant," they "may consider the fact that he has a vital interest in the outcome of the case and you may take the defendant's interest into account along with all other facts and circumstances bearing on credibility in deciding what weight his testimony deserves."  (Vol. VIII, Sent. Tr. at 19-20).  In Claim XVIII, Lesko contends the instruction rendered his sentencing proceeding fundamentally unfair and that, therefore, his defense counsel was ineffective for failing to object to the instruction.

The Pennsylvania Supreme Court rejected Lesko's contention that there was any error in the trial court's instructions, let alone one that rose to the level of a due process violation. Lesko XIII, 15 A.3d at 396-97.  Accordingly, it concluded, defense counsel was not ineffective for failing to raise a meritless challenge to the instruction.  Id.  In explaining its reasoning, the Pennsylvania Supreme Court observed that the trial court first issued the general instruction regarding witness credibility that directed jurors to consider whether all witnesses had an interest in the outcome of the case.  (See Vol. VIII, Sent. Tr. at 17-18).  Next, the Pennsylvania Supreme

_____

355 F.3d at 266 and citing Bronshtein, 404 F.3d at 716).  Lesko relies on Kelly in support of his contention that he was entitled to a Simmons instruction at his 1995 resentencing hearing.  His argument misses the point.  There is reason to believe that the trial court would have given the Simmons instruction if defense counsel had requested it. Therefore, the only issue is whether defense counsel was ineffective for making the choice not to request the instruction.

Court observed, the trial court gave additional, specific instructions regarding certain witnesses, including Lesko's brother, Michael (Id. at 18) and Rutherford (Id. at 19). After this, the court turned to Lesko's testimony, and instructed:

> In the instant case, the defendant took the stand as a witness. In considering the defendant's testimony you are to follow the general instructions I have given you, for judging the credibility of any witness. You should not disbelieve the defendant's testimony merely because he is a defendant. In weighing his testimony, however, you may consider the fact that he had a vital interest in the outcome of the case and you may take the defendant's interest into account of all other factors and circumstances bearing on credibility in deciding what weight his testimony deserves.

(Id. at 19-20).

The Pennsylvania Supreme Court held that after considering the instructions the trial court gave as a whole, it agreed with the PCRA court that the portion of the instruction that Lesko challenges "was not inflammatory or accusatory. Rather, 'the charge cautioned the jury that it should not disbelieve [Lesko] simply because he was the accused.'" Lesko XIII, 15 A.3d at 397 (quoting Lesko XII, No. 681 C 1980, slip op. at 64) (bracketed text in original). The Pennsylvania Supreme Court further explained:

> It is well settled that in reviewing a challenge to a jury instruction the charge, as a whole, must be considered. Furthermore, the trial court has broad discretion in phrasing the instructions, so long as the directions given "clearly, adequately, and accurately" reflect the law. See Commonwealth v. Gibson, 597 Pa. 402, 951 A.2d 1110, 1142 (2008).
> Viewing the instruction as a whole, the absence of language such as "just like the interests of any other witness" did not unfairly single out Lesko's testimony, or suggest that it was "suspect." In fact, the introductory sentence to the challenged charge clearly, adequately, and accurately instructed the jury that it was to apply the general credibility instructions to Lesko's testimony just as it would to any other witness. Moreover, contrary to the assertions of Lesko, the charge did not tell the jury to consider his testimony to be "suspect;" it just told the jury that it could "consider" his obvious interest in the outcome in weighing his testimony. This is a benign charge. Furthermore, Lesko's testimony was not the only testimony that was "singled out" for additional comment by the trial

112

court. Instructions to the jury are to be fair and accurate; they are not required to embody points that a party more properly should make in argument. Accordingly, we agree with the PCRA court that this claim of counsel ineffectiveness lacks arguable merit.

Id.

Lesko has not shown that the Pennsylvania Supreme Court's ruling on Claim XVIII "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S. Ct. at 786-87. It easily withstands review under AEDPA. Therefore, Claim XVIII is denied. A certificate of appealability also is denied.

**Claim XIX**

At the resentencing hearing, defense counsel requested that the court instruct the jury about the procedural history of the case so that the jury would not speculate that Lesko was being afforded an opportunity for a second penalty hearing because of something he had done improperly at the first trial or as the result of some unknown legal technicality. (Vol. II Sent. Tr. at 6-7). The trial court denied the requested instruction. (Id. at 13). Lesko argues that Marsh was ineffective for not challenging the trial court's ruling on direct appeal because he contends the ruling violated his Eighth and Fourteenth Amendment rights.

In support of his claim that the absence of the requested instruction violated his Eighth and Fourteenth Amendment rights, Lesko relies upon California v. Ramos, 463 U.S. 992 (1983) and Caldwell v. Mississippi, 472 U.S. 320 (1985) for the general proposition that accurate instructions to a sentencing jury are a significant constitutional safeguard. Both Ramos and Caldwell, however, are inapposite insofar as neither case addressed the situation presented by

113

Lesko's, *i.e.*, a defendant requesting that the jury be give a specific instruction regarding the procedural background of his case. Nevertheless, Lesko argues that <u>Ramos</u> and <u>Caldwell</u> support his contention that the Constitution required that his jury be given an explanation as to why he was being resentenced. Lesko argues that when the trial court denied his requested instruction, the jury was left to speculate on the reasoning for the resentencing and was allowed to inject arbitrary, capricious and unreliable factors outside the evidence and history of the case into its deliberations.

In denying relief on Claim XIX, the Pennsylvania Supreme Court rejected Lesko's argument that the jury may have considered inaccurate or arbitrary factors by virtue of the absence of the requested instruction. It held Lesko's argument was based upon pure speculation. <u>Lesko XIII</u>, 15 A.3d at 395. It also held that <u>Ramos</u> and <u>Caldwell</u> lent no support to his contention that the trial court had an affirmative duty to give the requested instruction about the background of his case, and rejected Lesko's contention that the trial court's decision rose to the level of a violation of the Eighth and Fourteenth Amendments. <u>Id.</u> at 395-96. The Pennsylvania Supreme Court further noted that "the focus of the resentencing hearing was to determine the existence of aggravating and mitigating circumstances and, if it came to it, to consider whether the aggravating circumstances outweighed the mitigating circumstances. Thus . . . the reason for resentencing was of no moment for the jury." <u>Id.</u> at 395. <u>See</u> <u>also</u> <u>id.</u> at 396 ("As the PCRA court aptly observed, the purpose of the procedures set forth in Section 9711 are directed at establishing whether the jury shall fix the sentence at death or life in prison. The jury's knowledge of the reason for resentencing would not further this goal.")

The Pennsylvania Supreme Court's decision that neither <u>Ramos</u> nor <u>Caldwell</u> supported Lesko's request for relief clearly was not "contrary to" those decisions. Thus, in order to be

entitled to relief here, Lesko must show that the Pennsylvania Supreme Court's decision was an "unreasonable application" of them. He has not met his burden. Unlike the situation in Caldwell, Lesko's jurors were not given inaccurate information. The Pennsylvania Supreme Court's determination that the holdings of Ramos and Caldwell should not be extended to require that, in cases such as Lesko's, the jury must be instructed about the reasons for resentencing, was not an unreasonable application of those decisions. See Woodall, 134 S. Ct. at 1706 ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.") (citation omitted). Stated another way, this Court cannot conclude that the Pennsylvania Supreme Court's decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S. Ct. at 786-87. Accordingly, Lesko is not entitled to relief on the Eighth and Fourteenth Amendment claims he makes in Claim XIX.[28]

The Pennsylvania Supreme Court's denied Lesko's related ineffective assistance claim because Ramos and Caldwell did not apply and Lesko "cites no case or other authority that [Marsh] could have invoke on direct appeal in support of a claim that the jury was required to be

---

[28]    The Pennsylvania Supreme Court also disagreed with Lesko's characterization of the prosecutor's conduct that led the Third Circuit in Lesko VIII to grant him habeas relief in the form of a new sentencing hearing. It stated: "[C]ontrary to Lesko's argument, the Third Circuit panel's opinion that constitutional error occurred in the initial sentencing proceeding did not establish that 'prosecutorial misconduct' required a new trial. Instead, the panel concluded that the prosecutor made 'improper comments' that infected the trial with unfairness, rendering the sentence proceeding tainted by a denial of due process." Lesko XIII, 15 A.3d at 396 (citing Lesko VIII, 925 F.2d at 1546). Lesko argues that the Pennsylvania Supreme Court's statement in this regard was an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). This Court need not reach that argument. Prior to making this statement, the Pennsylvania Supreme Court already had decided that "Lesko's claim is a non-starter" and that he "cites no case or other authority" to support it. Lesko XIII, 15 A.3d at 395. It also subsequently observed that even if "an easy, fair and accurate description of the operation of the grant of federal habeas relief were possible, we agree with the PCRA court that here, as in Caldwell, the topic was irrelevant to the resentencing jury's task[.]" Id. at 396.

115

informed of the reason for the resentencing." Lesko XIII, 15 A.3d at 395-96; see also id. at 396 ("Counsel's task on appeal would have been to show error in the trial court's discretionary ruling on his novel request; counsel had no relevant ammunition to pursue that argument."). Because counsel cannot be found ineffective for failing to raise a meritless claim on appeal, the Pennsylvania Supreme Court's adjudication of this portion of Claim XIX easily withstands review under § 2254(d) as well.

Based upon all of the foregoing, Claim XIX is denied. A certificate of appealability also is denied.

## Claim XXI

At the time of Lesko's direct appeal of his sentence, the Pennsylvania Supreme Court was statutorily required to conduct a comparative proportionality review during the direct appeal of all death penalty cases to determine whether similar defendants received similar sentences. 42 Pa. Cons. Stat. § 9711(h)(3)(iii) (repealed by Act No. 1997-28, effective June 25, 1997). When it conducted the required review, the Pennsylvania Supreme Court examined data compiled by the Administrative Office of Pennsylvania Courts ("AOPC") and also had at its disposal the verdict sheets and the review forms submitted by President Judges of the Court of Common Pleas. See, e.g., Commonwealth v. Gribble, 703 A.2d 426, 441 (Pa. 1997). The Pennsylvania Supreme Court conducted the required review in the direct appeal following Lesko's 1995 resentencing hearing and concluded that Lesko's sentence was "proportionate to sentences imposed in similar cases" and not "the product of passion, prejudice or any other arbitrary factor." Lesko X, 719 A.2d at 227.

In Claim XXI, Lesko asserts that his due process rights were violated because the Pennsylvania Supreme Court failed to provide him with a meaningful proportionality review and did not provide him with the opportunity to review and challenge the information upon which it relied. As a result, he contends, he also was deprived of adequate appellate review of his death sentence, in violation of the Eighth Amendment.

Lesko raised this claim in the PCRA proceeding. To support it, he presented a declaration from Professor Eugene P. Ericksen, Ph.D., an expert in statistics who studied and evaluated Pennsylvania's proportionality review database and stated that the data upon which the proportionality review was based was fundamentally flawed by systemic and case-specific defects. He opined that the system's flaws did not allow for a meaningful proportionality review. (Def.'s PCRA Ex. A).[29] Numerous other petitioners in death penalty cases have relied upon Dr. Ericksen's opinion or similar evidence and the Pennsylvania Supreme Court has consistently rejected that evidence and found that the data compiled by the AOPC is neither defective nor flawed. Accordingly, the PCRA court denied this claim in Lesko XI, No. 681 C 1980, slip op. at 19-20, and the Pennsylvania Supreme Court affirmed, citing to numerous cases in which it previously had denied the same claim. Lesko XIII, 15 A.3d at 417 (citing Commonwealth v. Spotz, 896 A.2d 1191, 1249 (Pa. 2006) (which collected cases in which it has denied the claim)).

Lesko has not met his burden of establishing that he is entitled to habeas relief on Claim XXI under § 2254(d)'s standard of review. In addition, it is worth noting that this same claim has been raised on numerous occasions by other Pennsylvania capital habeas petitioners

---

[29]     Lesko argues that the Court must accept Dr. Ericksen's declaration as true because the PCRA denied his request for a hearing on Claim XXI. That argument has no merit. The PCRA court held that Lesko was not entitled to a hearing on this claim because the Pennsylvania Supreme Court had already rejected Dr. Ericksen's opinion in previous cases. Lesko XI, No. 681 C 1980, slip op. at 19-20.

and district courts within the Third Circuit have consistently denied it, including most recently in Abdul-Salaam v. Beard, 16 F.Supp.3d 420, 473-74 (M.D. Pa. 2014), Marinelli v. Beard, No. 4:07-cv-0173, 2012 WL 5928367, *97-100 (M.D. Pa. Nov. 26, 2012), and Stevens v. Beard, 701 F.Supp.2d 671, 705-07 (W.D. Pa. 2010).

Based upon all of the foregoing, Claim XXI is denied. A certificate of appealability is denied as well.

## Claim XXII

In his final sentencing-phase claim, Lesko argues that the cumulative errors and cumulative prejudicial effect of his claims entitle him to relief from his death sentence. The Pennsylvania Supreme Court rejected this claim, explaining:

> [Lesko claims] that the cumulative effect of all of the errors he has alleged warrants a finding of prejudice, such that a new trial and sentencing phase is warranted. We have deemed two claims to be arguably meritorious and disposed of them solely on grounds of lack of prejudice – the Brady claims and the ineffectiveness claim related to remorse, where we assumed arguable merit. The notion of "cumulating" prejudice does not easily flow from our disposition of such disparate claims. We note, however, that the measure of Brady materiality and Strickland prejudice are the same: a grant of relief depends upon finding a reasonable probability that the result of the proceeding would have been different. Compare Strickler v. Greene, 527 U.S. 263, 280, 119 S. Ct. 1936, 144 L.Ed.2d 286 (1999) ("[Brady] evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,'") with Strickland, 466 U.S. at 694, 104 S. Ct. 2052 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") Even cumulating the ineffectiveness/remorse claim and the Brady claims, all deemed insufficiently prejudicial on their own, we have no doubt that the outcome of the resentencing would have been the same, given the jury's specific findings, the strength of the aggravators, and common sense. Accordingly, this claim fails. Cf. Commonwealth v. Johnson, 600 Pa. 329, 966 A.2d 523, 532 (2009).

Lesko XIII, 15 A.3d at 416-17.

There is no basis for this Court to conclude that the Pennsylvania Supreme Court's adjudication of this claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2). Therefore, the sentencing-phase portion of Claim XXII is denied. A certificate of appealability also is denied.

**E.**     **Conclusion**

For all of the reasons stated above, Lesko is not entitled to habeas relief on any of his claims. Accordingly, the Court hereby enters the following:

**II. ORDER**

John C. Lesko's Petition for a Writ of Habeas Corpus (**Doc. 12**) is **DENIED**, and a certificate of appealability is **GRANTED** only as to Claims I and II.

IT IS SO ORDERED.


January 20, 2015                                    s\Cathy Bissoon
                                                    Cathy Bissoon
                                                    United States District Judge

cc (via ECF email notification):

All Counsel of Record